CITY OF SUGAR LAND,
Texas, Appellant,

v.

HOME AND HEARTH SUGARLAND,
L.P., Appellee.

No. 11–05–00062–CV.

Court of Appeals of Texas,
Eastland.

Jan. 18, 2007.

---

J. Mark Breeding, Frederick D. Junkin, C. Charles Dippel, Paul S. Radich, Andrews Kurth, L.L.P., Houston, for appellant.

W. Allyn Hoaglund, Hoaglund Law Firm, Houston, John H. McFarland, Craig T. Enoch, Winstead Sechrest & Minick P.C., Austin, for appellee.

Panel consists of: WRIGHT, C.J., McCALL, J., and STRANGE, J.

## OPINION

JIM R. WRIGHT, Chief Justice.

This is an appeal in an eminent domain proceeding. Home and Hearth Sugarland, L.P. (Home and Hearth) owned a tract of land in the City of Sugar Land, Texas.[1] The City instituted condemnation proceedings in which it acquired the entire interest of Home and Hearth as to a portion of the property as well as a drainage easement across another portion of the property. Home and Hearth owned a hotel that was located on the remainder of the property, and the City did not seek any interest in that property. Special Commissioners awarded Home and Hearth $552,651 for the taking.

Home and Hearth appealed the award to the County Court at Law No. 1. The case was tried to a jury, and the trial court entered a judgment in accordance with the verdict. Because Home and Hearth had withdrawn the amount of the Commissioners' award, the trial court credited its judgment for $552,651 and awarded Home and Hearth $1,529,316.50 plus prejudgment interest of $231,322.50. We affirm.

---

1. "Sugar Land," the city, is comprised of two words, while Home and Hearth's registered name uses "Sugarland."

## Background Facts

On May 1, 1998, Home and Hearth purchased a 5.9873–acre tract of land located near the intersection of U.S. Highway 90–A and U.S. Highway 59 in Sugar Land, Texas.[2] On June 19, 1998, Home and Hearth obtained a building permit for the construction of a hotel. Home and Hearth constructed a three-story, extended-stay hotel on approximately 3 acres of the interior portion of the 5.9873–acre tract, leaving a 1.7709–acre tract to the north of the hotel site (fee area) and a 1.056–acre tract to the south of the hotel site. As required by the City, Home and Hearth constructed a detention pond on approximately .7 acres on the eastern portion of the 1.7709–acre tract.

The City filed condemnation proceedings by which it sought to take fee simple title to the 1.7709–acre tract in order to construct a regional detention pond. The construction plan for the regional detention pond incorporated the .7–acre detention facility already built by Home and Hearth. Home and Hearth had built the on-site detention pond in order to meet drainage requirements for obtaining a building permit. One month after Home and Hearth obtained the building permit, the City adopted Ordinance No. 1129 which changed the detention requirements for undeveloped property where Home and Hearth was located. The ordinance provided that a property owner could elect to pay an impact fee of $16,000 per acre instead of providing on-site detention in order to obtain a building permit.

The City also sought a drainage easement across the 1.056–acre tract. The amount awarded for this taking is not involved in this appeal. The City did not seek to condemn any interest in the property upon which the hotel was located.

However, Home and Hearth claimed that, in addition to damages for the taking of the 1.7709–acre tract and for the taking of the easement, the City owed it for damages to the hotel property that occurred as a result of that taking.

## The Appeal from the Commissioners' Award

After the appeal from the Commissioners' award, the case initially went to trial in November 2001. During the trial, the City moved for a trial amendment that would allow Home and Hearth drainage rights for the hotel property that was not taken. The trial court allowed the City to amend its pleadings in order to grant drainage rights for the hotel portion of the property but refused to allow a trial amendment as to Home and Hearth's other undeveloped tract not taken by the City. Home and Hearth moved for a mistrial, and the trial court granted the motion.

On April 12, 2004, the City filed its "First Amended Petition and Statement in Condemnation." At a later hearing, the City stipulated that Home and Hearth could drain its undeveloped property into the proposed regional detention pond at no cost to Home and Hearth. Together, the amended petition and the stipulation allowed Home and Hearth to drain the entire remainder into the regional detention facility.

In July 2004, the case was presented to a jury, and the jury returned its verdict that on the date of the taking, January 13, 2000:(1) the market value of the 1.7709–acre fee area (77,142–square feet) taken by the City was $14.75 per square foot; (2) the difference in the market value of the 0.0169 acres (736–square feet across the 1.056–acre tract) immediately before and

2. *See* diagram in Appendix A.

immediately after the taking was $1,472; and (3) the difference in the market value of the remainder immediately before and immediately after the taking was $390,000.[3]

The trial court denied the City's motion for judgment notwithstanding the verdict, and it entered a final judgment on the jury verdict. Subsequently, the trial court denied the City's motion to modify and its motion for new trial.

### The Issues

The primary issues in this case relate to the fair market value of the 1.7709–acre fee area and to the amount awarded for damages to the remainder as a result of the taking of the fee area. In this appeal, the City attacks the admissibility of the testimony of Home and Hearth's two expert witnesses, Vernon Henry and Matthew C. Deal. The City also contends that the trial court reversibly erred when it denied the City's request for a judgment notwithstanding the verdict because, without Henry's testimony and without Deal's testimony, the evidence was legally insufficient to support the jury's finding on the market value of the fee area taken as well as its finding regarding damages to the remainder resulting from the taking. The City also complains that the trial court abused its discretion when it denied the City's requested jury instructions.

### Admissibility of Expert Testimony Generally

■ Under TEX.R. EVID. 702, in order for an expert's testimony to be admissible, the expert must be qualified, and the expert's opinion must be relevant to the issues in the case and must be based upon a reliable foundation. *Guadalupe–Blanco*

*River Auth. v. Kraft,* 77 S.W.3d 805, 807 (Tex.2002) (applying the relevancy and reliability requirements of Rule 702 to testimony of expert appraisal witnesses in condemnation actions); *Gammill v. Jack Williams Chevrolet, Inc.,* 972 S.W.2d 713, 719 (Tex.1998). The trial court acts as an evidentiary gatekeeper to screen irrelevant and unreliable expert evidence. *Exxon Pipeline Co. v. Zwahr,* 88 S.W.3d 623, 629 (Tex.2002). A trial court has broad discretion to determine the admissibility of evidence, and the appellate court will reverse only if that discretion has been abused. A trial court abuses its discretion if it acts without reference to any guiding principles. *E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549, 556 (Tex.1995).

■ The reliability requirement under Rule 702 focuses on the basis of the expert's opinion—"the principles, research, and methodology underlying an expert's conclusions." *Zwahr,* 88 S.W.3d at 629 (citing *Robinson,* 923 S.W.2d at 557). Expert testimony is unreliable if it is no more than "subjective belief or unsupported speculation." *Id.* (citing *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 590, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)). Expert testimony is also unreliable if the court concludes that "there is simply too great an analytical gap between the data and the opinion proffered." *Gammill,* 972 S.W.2d at 726 (quoting *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997)).

■ In reviewing the reliability of expert testimony, the trial court is not to determine whether the expert's conclusions are correct; rather, the court should determine only whether the analysis used to reach those conclusions is reliable.

---

**3.** One acre is equivalent to 43,560 square feet. MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 11 (11th ed.2003).

*Zwahr,* 88 S.W.3d at 629 (citing *Gammill,* 972 S.W.2d at 728). Moreover, reliability is an issue of admissibility for the trial court, not a weight-of-the-evidence issue for the fact-finder. *See Gen. Motors Corp. v. Sanchez,* 997 S.W.2d 584, 590 (Tex.1999).

### Fee Area

### *The Testimony of Matthew C. Deal*

■■■■ The City asserts that the trial court erred in admitting the testimony of Home and Hearth's expert witness, Deal, on the issue of the fair market value of the fee area. We will discuss Deal's testimony on other issues later in this opinion. The City argues that Deal's testimony was unreliable because his determination of the highest and best use for the fee area was flawed.[4]

■■■■ Compensation for land taken by eminent domain is measured by the fair-market value of the land at the time of taking. *Zwahr,* 88 S.W.3d at 627; *City of Harlingen v. Estate of Sharboneau,* 48 S.W.3d 177, 182 (Tex.2001). Market value is defined as the price the property would bring when offered for sale by one who desires to sell but is not obliged to do so and bought by one who desires to buy but is under no necessity to do so. *Sharboneau,* 48 S.W.3d at 182, 189 (citing *State v. Carpenter,* 126 Tex. 604, 89 S.W.2d 979, 979 (1936); *State v. Windham,* 837 S.W.2d 73, 77 (Tex.1992)). In determining market value, the jury may consider all uses for which the property is reasonably adaptable and for which it is (or in all reasonable probability will become) available within the foreseeable future. *Id.*

■■■■ The highest and best use is defined as "[t]he reasonably probable and legal use of vacant land or an improved property, which is physically possible, appropriately supported, financially feasible, and that results in the highest value." AP-PRAISAL INSTITUTE, THE APPRAISAL OF REAL ESTATE 269 (9th ed.1987). The four factors to be used in determining the highest and best use are legal permissibility, physical possibility, financial feasibility, and maximal productivity. *Id.* 307–08. In determining the highest and best use of property, consideration must be given to "all of the uses to which the property is reasonably adaptable and for which it is, or in all reasonable probability will become, available within the foreseeable future." *Windham,* 837 S.W.2d at 77. Consideration cannot be given to uses which are purely speculative and unavailable. *City of Austin v. Cannizzo,* 153 Tex. 324, 267 S.W.2d 808, 814 (1954).

Deal testified that the highest and best use of the 1.7709 acres being acquired by the City, which is zoned for commercial use, was for commercial purposes, specifically a restaurant. The City does not disagree that the site in question was zoned for commercial purposes or that a restaurant could be built there. Instead, it argues that Deal made no effort to determine whether Home and Hearth would be able to use the *entire* fee area for commercial purposes within a reasonable time in the future. It is the City's position on appeal that the .7 of an acre previously used for a detention pond could not be used for a restaurant or other purposes and that, therefore, Deal's determination of the highest and best use was flawed and

---

4. Home and Hearth asserts that, because the City did not object at trial to Deal's testimony about the highest and best use and to the court's submission of Question No. 1, the City waived its complaint as to the reliability of Deal's opinion on the highest and best use.

The City, however, filed a pretrial motion to exclude. *Kraft,* 77 S.W.3d at 807 ("To preserve a complaint that an expert's testimony is unreliable, a party must object to the testimony before trial or when it is offered.").

his opinion was neither relevant nor reliable.

■ It is undisputed that the fee area was not being used for restaurant purposes at the time of the taking. When property is being valued for purposes other than that for which the property is being used at the time of the taking, before testimony is admissible as to the value for those purposes, it must be shown that the other use is one for which the property is adaptable, that such use is reasonably probable within a reasonable time or the immediate future, and that such use enhances the market value of the property. *Sw. Bell Tel. Co. v. Radler Pavilion Ltd. P'ship,* 77 S.W.3d 482, 486 (Tex.App.-Houston [1st Dist.] 2002, pet. denied).

The record shows that several hotels in the vicinity had adjacent restaurants. Deal testified that the property was reasonably adaptable in the near future for a fast-food restaurant and that such use would enhance the value of the hotel property. Deal testified that building a restaurant would have occurred within the reasonable future but for the taking. Deal further testified that the proposed use was legally permissible, physically possible, financially feasible, and maximally productive.

■ In arriving at the fair market value of property made the subject of condemnation proceedings, the preferred approach is to utilize comparable sales. *Sharboneau,* 48 S.W.3d at 182. A determination of the highest and best use of property facilitates the location and use of comparable sales in establishing the fair market value of the property. APPRAISAL INSTITUTE, THE APPRAISAL OF REAL ESTATE 270, 274 (9th ed.1987).

Deal arrived at the opinion that the fair market value of the fee area was $17.50 per square foot. To reach his conclusion, after determining the highest and best use of the fee area, Deal used four comparable sales in the vicinity of Home and Hearth. Those sales ranged in price from $13.50 per square foot to $18.59 per square foot with the respective acreage ranging from 1.0125 acres to 2.1159 acres. All of the comparable sales occurred within five years of the date of the taking in this case.

One of the comparable sales used by Deal included a 2.1159–acre tract. The buyer of that tract paid $16.27 per square foot for the property even though it had no detention pond and even though drainage issues would have to be addressed. Ordinance No. 1129, adopted by the City on July 21, 1998, approximately one month after Home and Hearth obtained a permit to build a hotel, required that property owners in the area bounded by U.S. Highway 59 and U.S. Highway 90–A "make use of the Regional Drainage Facilities by participating in the payment of the cost of the facilities as an alternative to providing onsite detention facilities."

■ In the "willing seller—willing buyer test" of market value, all factors should be considered that would reasonably be given weight in negotiations between a seller and a buyer. *Radler Pavilion,* 77 S.W.3d at 485–86 (citing *Cannizzo,* 267 S.W.2d at 814). The testimony shows that a buyer would consider drainage issues in acquiring the 1.7709–acre site—either to provide for onsite detention or pay the fee to use the proposed regional facility. The fact that the 1.7709–acre site already had a detention site would be a factor to consider in negotiations between a willing buyer and willing seller in settling on the fair market value.

*The Testimony of Edward Schulz*

■ Edward Schulz, an expert witness for the City, testified that the 1.7709 acres taken by the City, which fronts U.S. High-

way 90–A, had a different price per square foot than the 1.056–acre tract, which fronts U.S. Highway 59. There was no claim that the .7 of an acre constituted an economic unit apart from the other property in the fee area. An economic unit is a portion of property that is economically self-sufficient to support the highest and best use independent of the remaining portions of the whole property. *See Zwahr*, 88 S.W.3d at 628. Schulz testified that the price difference was attributable to the different locations and not to the detention pond or to any other difference in the conditions of either tract. Schulz valued the entire fee area at $7.50 per square foot without differentiation relating to the .7 of an acre detention pond.

We hold that Deal's testimony regarding the fair market value of the fee area was both relevant and reliable and that the trial court did not abuse its discretion when it admitted the testimony. The City's issues on appeal pertaining to testimony of the value of the fee area are overruled.

### *The Remainder Tract*

### *The Testimony of Vernon Henry*

 Home and Hearth called Vernon Henry to testify as an expert regarding drainage and safety issues. The City argues that the trial court erred in allowing Henry to testify as an expert for Home and Hearth because he was not qualified to testify on those issues, "and his opinions and testimony on such matters in this case thus were wholly unreliable." In deciding whether an expert is qualified, the trial court must ensure that the purported expert truly has expertise concerning the actual subject about which the expert is offering the opinion. *Gammill*, 972 S.W.2d at 719.

The record reflects that Henry was a land planner, that he was president of his own land planning firm (established in 1967), and that he had over 40 years experience with planning. Henry had two degrees in the architectural and design field and had taken graduate courses in planning at a number of universities. For the past fifteen years, Henry had dealt with detention and drainage issues as an expert advisor for developers. As part of Henry's job and experience as a land planner, he was required to evaluate risk of harm and safety issues pertaining to detention ponds. That he did not design detention ponds and that he had not written articles on safety and was not a licensed engineer does not mean Henry was not qualified to testify on safety and drainage issues.

 Among other information, Henry reviewed the plans of the City's proposed regional detention pond, the existing detention pond on Home and Hearth's property, depositions of various witnesses, the manner in which other detention facilities in the area were constructed, and the issues addressed by other developers in relation to detention, including safety. After evaluating the design of the City's proposed regional detention facility, Henry testified that it would be more appropriate if the detention pond were to have a more gradual slope, that the area would be safer with a fence around the remaining property, and that a safety ledge should be installed in the detention pond.[5]

 The record reflects that Henry was qualified. We further hold that Henry's testimony as to the safety and drainage issues was relevant and reliable under

---

5. The dimensions of the regional detention pond were to be approximately 400 feet long, 130 feet wide, 19 feet deep, with a 5.9–foot static water level at all times and side slopes at a 3–to–1 ratio.

Rule 702.[6] *Zwahr*, 88 S.W.3d at 629 (citing *Robinson*, 923 S.W.2d at 556); *Sharboneau*, 48 S.W.3d at 186. The trial court did not abuse its discretion when it admitted Henry's testimony about those issues.

### The Testimony of Matthew C. Deal

The City's raises several issues in connection with Deal's opinion regarding the damages to the remainder property which resulted from a taking of the fee area. These issues may be grouped into two general categories: (1) improper application of the cost-to-cure doctrine and (2) improper assessment of other damages to the hotel property.

### Cost to Cure

Home and Hearth presented evidence that the construction of the regional detention pond on the fee area created a safety risk to that portion of the remainder property upon which the hotel was located. The testimony showed that the risks could be reduced by redesigning the measurements of the pond, by adding a ledge around the pond, or by constructing a fence between the hotel tract and the detention pond. According to Home and Hearth's evidence, it would cost $528,080 to construct the fence. It would be necessary to construct a portion of the fence upon property owned by a third party.

■■■■ The City complains that the evidence regarding the cost of the fence was not admissible because it did not meet the foundational requirements for the introduction of "cost to cure" evidence in condemnation cases. "Cost-to-cure" cases are those in which the condemnor seeks to prove that any diminution in the market value of a remainder resulting from a partial taking can be cured at a cost less than the diminution. The method is "never used except as a method of decreasing the amount of severance damages which would be due under the before and after rule," and this is not a "cost-to-cure" case. 4A JULIUS L. SACKMAN, NICHOLS ON EMINENT DOMAIN § 14A.04[2], at 14A–99 (rev.3ed.2001). The City's issues regarding cost to cure are overruled.

■■■■ When only a part of a tract is taken, as here, the landowner is entitled to (1) the fair market value of the part taken and (2) any damage to the remainder as a result of the taking. *Zwahr*, 88 S.W.3d at 627; *State v. Carpenter*, 126 Tex. 604, 89 S.W.2d 194, 199 (1936). Determination of the fair market value of remainder property requires measuring the difference between the value of the property immediately before and immediately after the taking. *Zwahr*, 88 S.W.3d at 627; *Callejo v. Brazos Elec. Power Coop., Inc.*, 755 S.W.2d 73, 76 (Tex.1988). It was Home and Hearth's burden to establish the fair market value of the property. *Religious of the Sacred Heart of Tex. v. City of Houston*, 836 S.W.2d 606, 613 (Tex.1992).

■■■■ The cost of the fence was admissible, not as a separate element of damage, but as information that could be used by the jury to arrive at the diminished value of the remainder tract after the taking, if any. As the Texas Supreme Court explained in *Carpenter*, 89 S.W.2d at 199–200.

> [T]he parties would have the right to introduce evidence of everything that would tend to affect the value of the land, in the estimation of a proposed purchaser, or that would tend to make it

---

**6.** In its brief, the City makes references to various defects in qualifications and opinions pertaining to Henry. Many of those references are to the clerk's record only and not to the reporter's record. We are not required to search the reporter's record to determine whether the clerk's record references were also made a part of the reporter's record of evidence actually presented to the trial court or to the jury. *See* TEX.R.APP. P. 38.1(h).

more or less valuable to the present owner, such as the shape in which the tract will be left; the increased amount of fencing, if any, that will be required; the increased expenditures made necessary to provide water.... But this evidence is introduced, not as constituting the measure of damages, but as elements to enable the jury to arrive at the correct measure, which, as above stated, is the lessened value of the tract, if any, caused by these different elements, when all are taken into consideration.

. . . .

... These elements of damage and value are neither the measure of damages, nor are they allowed as specific items of damage. They go to the jury only to throw light on the general question of depreciation.

. . . .

... [I]t is proper as touching the matter of the value and depreciation in value to admit evidence upon all such matters as suitability and adaptability, surroundings, conditions before and after, and all circumstances which tend to increase or diminish the present market value.

Deal's testimony regarding the value of the remainder before and after the taking was admissible. *See Holiday Inns, Inc. v. State*, 931 S.W.2d 614 (Tex.App.-Amarillo 1996, writ denied). The trial court did not err when it admitted Deal's testimony.

*Deal's Other Testimony on Before and After Values of the Remainder Property*

In their last issue with respect to Deal's testimony, the City asserts that Deal's testimony regarding a 10% diminution in the value of the hotel site was flawed because Deal failed to employ the proper methodology in establishing the value of the remainder tract before the taking.

 The City argues that Deal should have used the comparable sales approach instead of the cost and income approaches in valuing the hotel site prior to the taking. It is true that the preferred method for arriving at market value is the comparable sales method. *Sharboneau*, 48 S.W.3d at 183. However, "[w]hen comparable sales figures are lacking or the method is otherwise inadequate as a measure of fair market value, courts have accepted testimony based on the cost approach and the income approach." *Id.*

 In order to calculate the diminution to the value of the hotel, Deal used the cost approach to support his damage model and then used the income approach as a method of comparison. Whether to allow testimony as to the cost approach in order to determine the fair market value of real property is a function of the trial court as the gatekeeper. *See* Rule 702; *Sharboneau*, 48 S.W.3d at 183. The cost approach looks to the cost of replacing the improved property while taking depreciation into account. That method is appropriate for assessing the value of improved property that is unique in character and not frequently exchanged in the marketplace. *Religious of the Sacred Heart*, 836 S.W.2d at 616. The income approach is appropriate when the property, in the open market, would be priced according to the income it already generates. *Sharboneau*, 48 S.W.3d at 183. No matter which appraisal method an expert uses, the goal is always to find the fair market value of the condemned property. *Id.* An appraisal method is valid if it produces an amount that a willing buyer would actually pay to a willing seller. *Id.*

 The record shows that Home and Hearth's hotel was situated in a unique location. The property is flanked by two major traffic arteries, U.S. Highways 90–A and 59, which pass through Sugar Land. Due to a planned construction change to

the interchange of the two highways, Home and Hearth would have direct access to both highways, and the property was the only improved property in the area. The hotel was completed during the second quarter of 1999, while the date of the taking was January 2000. Although the cost approach generally is less accurate the older a property is, here, less than one year passed between the completion of construction and the date of the taking. *Id.* The record shows that the property was unique in character and not frequently exchanged in the market place. The cost approach was, therefore, a proper barometer for assessing market value of the tract before the taking. Because the evidence revealed that the cost approach was an acceptable method of establishing market value before the taking in this case, the trial court did not err in its role as gatekeeper when it admitted this testimony.

Deal also testified that the hotel property had suffered a 10% reduction in value brought about by the taking of the fee area. If the City had not taken the fee area, Home and Hearth could have built a fast-food restaurant or a restaurant on the fee area. A restaurant located on the fee area would enhance the value of the hotel property. Deal testified that the 10% reduction in value of the hotel property amounted to $508,722 and that the total diminution in value to the remainder tract attributable to the taking of the fee area was $1,037,802.[7]

Schulz, the City's expert, testified that there was no damage to the remainder property. He determined that the value of the 3.1603 acres of land underlying the hotel would be $8 per square foot. That would total approximately $1,095,000 for the land underlying the hotel. Although Schulz did not believe that the value of the hotel on the remainder tract should be considered, he did testify that, if the value of the underlying land is added to the value of the hotel property, the total would be $5,090,000. This amount is $22 more than Deal testified to under the cost approach.

Deal's testimony on the market value of the remainder before and after the taking was admissible. The trial court did not err in admitting it.

### The City's Posttrial Motions

The City further challenges the trial court's rulings on its motion to disregard the jury's answers regarding the fee area and the remainder tract and its failure to grant a judgment notwithstanding the verdict. Its complaint is essentially that, because Henry's testimony and Deal's testimony was not admissible, there is no evidence to support the verdict of the jury on those issues.

An appellate court reviews a ruling on a motion for judgment notwithstanding the verdict under a legal sufficiency or "no-evidence" standard of review. We will review only the evidence tending to support the jury verdict and disregard all evidence to the contrary. *Sherman v. First Nat'l Bank in Center, Tex.*, 760 S.W.2d 240, 242 (Tex.1988). We will uphold a jury verdict if more than a scintilla of evidence supports the jury finding. *Garcia v. Ins. Co. of State of Pa.*, 751 S.W.2d 857, 858 (Tex.1988).

We have held that the evidence with respect to the fee area and to the remain-

---

7. In its brief, as with Henry's testimony, the City makes references to various opinions by Deal. Many of those references are to the clerk's record only and not to the reporter's record. We are not required to search the reporter's record to determine whether clerk's record references were also made a part of the reporter's record of evidence actually presented to the trial court or to the jury. *See* Rule 38.1(h).

der is admissible. Therefore, there is some evidence, more than a scintilla, to support the verdict of the jury. The City's issues regarding its postjudgment motions regarding the remainder tract are overruled.

*Jury Charge Complaints*

In their last two issues, the City asserts that the trial court abused its discretion in excluding two requested jury instructions. At the original charge conference, both parties objected to the court's charge. Home and Hearth's objections were overruled. The trial court sustained the City's objection to an instruction by the trial court and overruled the City's request to include two other instructions. The trial court prepared an amended charge and again asked for objections. Home and Hearth had no objections, and the City asserted only an objection to the jury considering cost-to-cure damages:

> THE COURT: The Court [has] prepared an amended charge for the jury. We're here to entertain objections on behalf of the Defendant?
>
> [DEFENDANT'S COUNSEL]: Okay. We have no objections to the Court's charge.
>
> THE COURT: On behalf of the Plaintiff?
>
> [PLAINTIFF'S COUNSEL]: Your Honor, our objection was stated at the conclusion that we believe that the jury should be instructed not to consider the cost of cure damages for the reasons we previously stated.
>
> THE COURT: All right. That's overruled.

 Home and Hearth asserts that the City waived any complaint directed at the jury instructions because the City did not re-urge their objections and re-tender substantially correct instructions after the trial court amended its charge. The objec-

tion finally made to the trial court by the City was not the objection previously made. After the charge had been amended, the City's objection was, "[W]e believe that the jury should be instructed not to consider the cost of cure damages." The instructions previously tendered to the trial court did not address cost to cure. The issues on appeal do not comport with the final objection made to the trial court, and the issues are waived. Tex.R. Civ. P. 274, 278; Tex.R.App. P. 33.1(a).

 Even if we were to hold that the issues were not waived, we hold that the trial court did not abuse its discretion when it refused to include the City's two proposed instructions. The trial court has considerable discretion in deciding what instructions are necessary and proper in submitting issues to the jury. *In re V.L.K.,* 24 S.W.3d 338, 341 (Tex.2000). The trial court has considerable discretion in determining necessary and proper jury instructions. *Id.* When a trial court "refuses to submit a requested instruction, the question on appeal is whether the request was reasonably necessary to enable the jury to render a proper verdict." *Tex. Workers' Comp. Ins. Fund v. Mandlbauer,* 34 S.W.3d 909, 912 (Tex.2000). A trial court abuses its discretion by acting arbitrarily, unreasonably, or without consideration of guiding principles. *Walker v. Gutierrez,* 111 S.W.3d 56, 62 (Tex.2003). The City complains that the trial court abused its discretion in not allowing the following instruction:

> You are further instructed that in determining the fair market value of the Fee Area and the Easement, you shall determine such value based on the condition of Defendant's property as of January 13, 2000–taking into account all relevant factors that affect its valuation,

including the market for its possible future use.

The City urges that Deal, during his testimony, did not consider limitations on the development of the fee area and that the trial court's failure to instruct "opened the door for the jury to base its determination on speculative uses for which a portion of the Fee Area was not available as of January 13, 2000." The City further argues that, by allowing the jury to consider the definition of the highest and best use in the charge and not the above instruction, the trial court "essentially foreclosed reliance on Mr. Schulz's testimony in answering Question Nos. 1 and 3. The jury was left with only testimony of Mr. Deal on which to base its verdict."

A review of the entire record shows that it was clear during trial, in the instructions, and in questions actually submitted to the jury that the date of valuation of the fee area was January 13, 2000, and that the proper consideration in determining fair market value of the fee area being taken was January 13, 2000. In connection with its definition of market value, the trial court instructed the jury as follows:

> [W]ith both seller and buyer taking into consideration all the uses both for which the property is reasonably adaptable and for which the property in all reasonable probability will become available within the reasonable future. In making your determination of market value, you will consider the highest and best use of the land involved.

The trial court properly instructed the jury on market value. The instruction given is almost identical to the instruction approved in *Cannizzo*, 267 S.W.2d at 815. Further, the trial court correctly instructed the jury to consider the highest and best use of the property. As we have stated, that is an accepted tenet in arriving at market value. *See* APPRAISAL INSTITUTE, THE APPRAISAL OF REAL ESTATE 269 (9th ed.1987). The trial court did not abuse its discretion when it excluded this instruction.

■ The City also appeals the trial court's refusal of an instruction that defines the fee area, the purpose of the fee area and easement acquisitions, the current and future drainage rights of Home and Hearth, and the details of mineral and dedication rights of Home and Hearth. Apart from the details of mineral and dedication rights, all of this information was in the record. Such information is evidentiary in nature. We cannot conclude and the City did not show, given the trial court's considerable discretion, that this instruction was reasonably necessary to enable the jury to render a proper verdict under the record in this case.

Even if we were to hold that the City did not waive its complaint regarding its requested instructions, the trial court did not abuse its discretion in refusing them because the instructions were not "reasonably necessary to enable the jury to render a proper verdict." *Mandlbauer*, 34 S.W.3d at 912. We overrule all of the City's issues.

### This Court's Holding

The judgment of the trial court is affirmed.

APPENDIX A

**Taking Map** H&H 00501