# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-07-00069-CV

**The State of Texas, Appellant**

**v.**

**Lloyd S. McCarley et al., Appellee**

---

**FROM THE COUNTY COURT AT LAW NO. 4 OF WILLIAMSON COUNTY**
**NO. 03-0400-CC2-4, HONORABLE JOHN McMASTER, JUDGE PRESIDING**

---

## CONCURRING OPINION

I concur in the majority's decision to affirm the judgment of the county court, but write separately in the interest of fully addressing the issues raised by the parties on appeal.

This appeal arises from a statutory condemnation action filed by the State of Texas against Lloyd S. McCarley for a portion of his property needed for a highway project. The jury awarded $371,000 to McCarley. In five issues, the State contends on appeal that (1) McCarley's claim for damages was an inverse condemnation claim; (2) the trial court did not have subject matter jurisdiction over the inverse condemnation claim because it was not ripe; (3) the State has sovereign immunity because McCarley failed to plead and prove the requisite intent for an inverse condemnation claim; (4) McCarley does not have a justiciable interest in the inverse condemnation claim; and (5) there was no competent evidence or, in the alternative, insufficient evidence to support

the jury's award of $371,000 in damages. For the reasons that follow, I would affirm the county court's judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

In April 2004, the State brought a condemnation suit to acquire a "corner clip" of McCarley's property located at the corner of Ranch Road 620 and Lyndhurst Street in Williamson County. The State sought to acquire 836 square feet of land as part of its project to widen and improve Ranch Road 620 to become State Highway 45. The project included elevating the highway frontage road by several feet above existing grade on a solid retaining wall across McCarley's property and elevating Lyndhurst for several hundred feet to meet the new, higher frontage road at the former intersection with 620. The county court appointed a panel of special commissioners to determine the amount of adequate compensation to be paid by the State. The commissioners awarded McCarley $4,180 in damages. McCarley objected to the commissioners' award and appealed to the county court.

At the time of the condemnation, McCarley's property, consisting of two lots and approximately 1.75 acres, was vacant. The lot that fronted 620 ("Lot 1") was zoned, in part, "GR, retail," and the lot that fronted Lyndhurst ("Lot 2") was zoned "interim single family."[1] The City of Austin had approved a site plan for the two lots in 1998, requiring the "unified development" of the two lots for water quality and stormwater detention. The permitted use under the 1998 site plan

_____

[1] The State provided evidence that Lot 1 was zoned in part GR (community commercial) and in part single family at the time of the taking. The parties agreed, however, that prior to the taking, the highest and best use for Lot 1 was for it to be developed commercially, although they disagreed on the type of commercial development.

was retail for Lot 1 and office or warehouse for Lot 2. The 1998 site plan for the two lots expired in 2001, and McCarley did not apply for additional site development permits prior to the condemnation suit.

Prior to trial, McCarley filed a "conditional counterclaim in inverse condemnation" for "damages resulting from the drainage problems caused by [the State's] project." In response, the State filed a plea to the jurisdiction and a motion to exclude McCarley's evidence. In the plea to the jurisdiction, the State asserted that McCarley's counterclaim should be dismissed based on sovereign immunity because he failed to plead the "intent" required for an inverse condemnation claim, that there was a lack of ripeness because no flooding had occurred and no site plan had been denied, and that McCarley lacked a justiciable interest because he no longer owned the property. In the motion to exclude McCarley's evidence, the State sought exclusion on similar grounds to its plea to the jurisdiction. The trial court denied both the plea and the motion, and the case proceeded to trial.

At trial, McCarley called three experts, a land planner/development consultant, a civil engineer/design consultant, and a real-estate appraiser. The land planner testified that he assisted McCarley in the site planning process, starting in 1996 and continuing through the 1998 approval of the site plan for the lots' development. He testified that the process took "about 16 months." He also testified that McCarley contacted him after the site plan expired about resubmitting the site plan for approval, but that resubmission was put on hold after McCarley learned of the State's highway project.

The engineer testified concerning the highway project's drainage system. He opined that the system prevented McCarley's remainder property from being developed within the City of

3

Austin's requirements for stormwater management. The engineer testified that the City requires that a property be designed to receive and address all stormwater from a 100-year storm event that would flow to the property from the drainage basin upstream. It was the engineer's opinion that as a result of the drainage system, stormwater would back up on the remaining property in a 100-year storm event and the City of Austin would not grant a permit for any type of development for the remainder.

McCarley's appraiser testified to the market values of the property before and after the taking and the effect of the State's drainage system on the remainder's value. He recommended compensation for the taking of $403,000. His recommendation was based in part on the engineer's conclusions concerning the inability to develop the property after the taking because of the highway project's drainage system. He testified that the highest and best use for Lot 1 at the time of the taking was commercial or retail, and he placed a value on Lot 1 prior to the taking of $400,000. He supported his value by analyzing comparable sales in the area. He testified that Lot 2's highest and best use was "office/warehouse," and he placed a value of $75,000 on Lot 2 prior to the taking, also based on comparable sales in the area. He concluded that the remainder value for both lots after the taking was $72,000. He reached this conclusion by reducing the lots' value before the taking by 85% due to the inability to develop the property in light of the highway project's drainage system. In reaching the remainder's value, he compared "properties that had flooding problems and those that didn't, and then compared how much the difference of prices were." He also arrived at a similar value for the remainder using the income approach, "what a buyer would pay for a particular income stream." Under this approach, he compared rents for commercial sites that were used for "outdoor vendor sales" such as Christmas trees to arrive at a value for the remainder property.

The State's witnesses were the engineer in charge of the highway project's construction, a land planner/architect, and a real-estate appraiser. The engineer explained the design and construction of the highway project's drainage system. The land planner/architect testified concerning zoning for Lot 1, concluding that the "highest zoning" was "neighborhood office." Relying in part on the State's other expert's conclusions, the appraiser recommended compensation for the taking in the amount of $4,682, the market value of the 836 square feet. The appraiser did not include any compensation for the remaining property as it was his opinion that the condemnation of the 836 square feet did not reduce the remainder's value. His opinions were confined to Lot 1, placing a value of approximately $240,000 on the lot immediately before and after the taking, and that "neighborhood office development" was the highest and best use for the lot. He was aware of McCarley's reports that the "drainage system would not work right," but his opinions assumed that the property could "get a site development permit," and relied on the State's engineering report that "the drainage worked just fine."

The jury was given one question—the difference in market value of McCarley's property immediately before the taking and the market value of the remaining property after the taking, with definitions of "fair market value" and "highest and best use":

> On September 16, 2003, what was the difference between (a) the fair market value of the landowner's whole property before the taking, excluding any consideration of the condemnation or proposed project and (b) the fair market value of the remainder only, after the taking, giving consideration to the uses to which the condemned part is to be subjected.
>
> "Fair Market Value" means the price which the property would bring when it is offered for sale by one who desires, but is not obliged to sell, and is bought by one who is under no necessity of buying it, taking into consideration all of the uses

5

to which it is reasonably adaptable and for which it either is or in all reasonable probability will become available within a reasonable future period. In making your determination of Fair Market Value, you will consider the "Highest and Best Use" of the land involved.

"Highest and Best Use" means that legal use to which the property could have been adapted on the date of taking, or within the reasonably foreseeable future thereafter which was legally permissible, physically possible, financially feasible, and provided the owner with the greatest net return.

After the jury determined the difference in value to be $371,000, the county court credited the State's prior deposit of the amount of the special commissioner's award against the jury's award and entered judgment against the State. The State's appeal followed.

## ANALYSIS

### *Standard of Review*

The State raises both legal and factual sufficiency issues as to the jury's award of damages for the statutory partial taking of McCarley's property. "In determining whether a finding is supported by legally sufficient evidence, we consider the evidence in the most favorable light, and indulge every inference in its favor." *Tarrant Reg'l Water Dist. v. Gragg*, 151 S.W.3d 546, 552 (Tex. 2004). "If the record contains more than a scintilla of evidence that supports the finding, we must sustain it." *Id*. Incompetent evidence is legally insufficient to support a judgment. *City of Keller v. Wilson*, 168 S.W.3d 802, 812 (Tex. 2005).

In reviewing the factual sufficiency of the evidence, we consider, weigh, and examine all the evidence presented at trial, including any evidence contrary to the judgment. *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989). We set aside a finding for factual

6

insufficiency if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). With both legal and factual sufficiency review, the starting point of analysis is the charge that was submitted to the jury absent complaint on appeal. *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000); *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 762 (Tex. 2003).

Whether damages for a taking are compensable under the constitution depends on the type of damage involved, and compensability is a question of law for the court, subject to *de novo* review. *County of Bexar v. Santikos*, 144 S.W.3d 455, 459 (Tex. 2004); *Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 220 (Tex. 2001).

### Inverse Condemnation

The State asserts that McCarley's claim for damages due to his alleged injury from the State's drainage system was an inverse condemnation claim and that such claim was not ripe for determination during the statutory condemnation case because the highway project was still under construction, no site development permit had been denied, and no flooding had occurred on the remaining property. The State also argues that McCarley did not plead or prove the requisite intent and that McCarley lacks a justiciable interest because he sold the property. The State contends that although a claim concerning the drainage system may be actionable at some point in the future, the claim can be brought only in inverse condemnation because it relates to the "anticipated effect of drainage improvements being constructed by [the State] in its existing right-of-way, and does not relate to the use of the 836 square feet being acquired." The State argues McCarley's claim is

7

inverse because the State did not seek as part of its statutory condemnation to inundate McCarley's remainder with stormwater runoff from its drainage system.

"When the government takes private property without first paying for it, the owner may recover damages for inverse condemnation." *Gragg*, 151 S.W.3d at 554. To recover on an inverse condemnation claim, a plaintiff must plead and prove an intentional governmental action, resulting in a taking, damage or destruction of property, for public use without process or a proper condemnation proceeding. *See* Tex. Const. art. I, § 17; *General Servs. Comm'n v. Little-Tex. Insulation Co.*, 39 S.W.3d 591, 598 (Tex. 2001); *City of Houston v. Texan Land & Cattle* Co., 138 S.W.3d 382, 387-88 (Tex. App.—Houston [14th Dist.] 2004, no pet.).

Although McCarley could have brought an inverse condemnation action had there been no partial taking, a further proceeding was not appropriate or necessary in light of the already pending condemnation proceeding. *See Westgate, Ltd. v. State*, 843 S.W.2d 448, 452 (Tex. 1992) (inverse claim and statutory condemnation claim addressed in same proceeding); *State v. Fiesta Mart, Inc.*, 233 S.W.3d 50, 56-57 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (court had subject matter jurisdiction to hear both State's statutory condemnation claim and leaseholder's inverse condemnation counterclaims for damage to personal property and business loss caused by impaired access); *Texan Land & Cattle* Co., 138 S.W.3d at 386-88 (damages awarded for inverse claim for blocking access to property prior to condemnation and statutory claim for fair market value of property in same proceeding); *City of Austin v. Casiraghi*, 656 S.W.2d 576, 579-80 (Tex. App.—Austin 1983, no writ) (damages for loss of business brought in separate cause of action for inverse condemnation not allowed because not plead in statutory condemnation action); *cf. Dahl*

*v. State*, 92 S.W.3d 856, 863 (Tex. App.—Houston [14th Dist.] 2002, no pet.) (inverse condemnation claims "duplicative" of State's condemnation action do not comprise valid inverse claims).

The trial court properly allowed McCarley as the landowner to recover all of the damages to his property in a single action. *See White v. Natural Gas Pipeline Co.*, 444 S.W.2d 298, 301 (Tex. 1969) (landowner "not to be burdened with the delay and expense of future lawsuits"); *City of LaGrange v. Pieratt*, 175 S.W.2d 243, 246 (Tex. 1943) (landowner must raise all reasonably foreseeable claims in statutory condemnation proceeding); *Casiraghi*, 656 S.W.2d at 579 (property owner given "single opportunity" to recover for the taking of property).[2] Because McCarley was aware of the injury to his property from the drainage system, whether his claim was "inverse" or not, he properly brought it in the statutory condemnation proceeding. *See Spindor v. Lo-Vaca Gathering Co.*, 529 S.W.2d 63, 65-66 (Tex. 1975) (recovery may be had in condemnation proceedings for injuries to the remainder which are reasonably foreseeable at the time of condemnation); *Pieratt*, 175 S.W.2d at 246 (if reasonably foreseeable claims are not brought, they may be forever barred).

---

[2] Because McCarley's claims concerning the drainage system in the statutory proceeding were known to him, he had a duty to bring those claims in the condemnation proceeding or risk losing them. *See City of LaGrange v. Pieratt*, 175 S.W.2d 243, 246 (Tex. 1943). In *Pieratt*, the supreme court held that when a tract of land is condemned for roadway purposes and an owner claims consequential damages to the remainder, all claims must be presented that could reasonably have been foreseen and determined at the time, or they would be subsequently barred. *Id*. After the condemnation action for a partial taking of his land had already concluded, Pieratt brought a separate suit seeking lost profits in his business during construction of the improvements to the street. *Id*. at 244-45. Pieratt argued that his claim for lost profit damages was uncertain at the time of the condemnation action. *Id*. at 246. In barring his subsequent suit, the supreme court stated that, in the condemnation context, a plaintiff's damages for reasonably foreseen claims must only "be ascertained with a reasonable degree of certainty," and the requirement is not that the damages be "certainly or definitely proved." *Id.* at 246-47.

*1.     Was McCarley's claim ripe?*

The State argues that McCarley's claim concerning the State's drainage system was not ripe because the highway project was still ongoing, there had been no flooding on his property, and there had been no permit denial at the time of the statutory condemnation. In support of its argument that McCarley's claim was not ripe because the highway project had not been completed, the State cites *Hubler v. City of Corpus Christi*, 564 S.W.2d 816 (Tex. Civ. App.—Corpus Christi 1978, writ ref'd n.r.e.). In *Hubler*, the court dismissed the plaintiff's inverse condemnation claim because the governmental drainage plan at issue was a series of projects and not all of the projects were completed, and the plaintiff did not claim that his land's value had been decreased by the completed projects but that the land value would be decreased at the conclusion of the series of projects. *Id*. at 821-24. The court concluded that the plaintiff's evidence of a decrease in market value was "too remote and speculative." *Id*. at 822. Unlike *Hubler*, there was evidence in this case that the market value of McCarley's remainder had decreased at the time of the statutory condemnation proceeding and that the decrease was caused by the substantially complete drainage system. *See id*. at 822.[3] The drainage system's status of construction did not prevent McCarley's claim from being ripe.

The State cites *State v. Malone*, 168 S.W.2d 292, 298 (Tex. Civ. App.—Austin 1943, writ ref'd w.o.m.), to support its position that McCarley's claim was not ripe because there had been no flooding on his property. In *Malone*, the State constructed a highway entirely in its own right-of-

---

[3] The evidence showed that the drainage system's design was complete "for all intents and purposes" and that construction was substantially complete.

way and did not acquire any portion of the plaintiff's land for the highway's construction. *Id.* at 294. The plaintiff purchased the land after the project was completed and sought damages to his crops and soil when his property flooded as a result of the highway's construction. *Id*. at 298. Unlike the landowner in *Malone*, McCarley did not seek damages to his property from flooding. McCarley sought damages because the drainage system precluded his remaining property from being developed. Given McCarley's claim was that he could not develop his property, actual flooding was not required for McCarley's claim to be ripe. *See Spindor*, 529 S.W.2d at 65-66.

The State also relies on *Coble v. City of Mansfield*, 134 S.W.3d 449, 458-59 (Tex. App.—Fort Worth 2004, no pet.), in support of its argument that McCarley's claim was not ripe because no permit had been denied on McCarley's property. In *Coble*, the landowner was denied damages for the estimated cost of compliance with a subdivision ordinance (the cost of required improvements) as part of his remainder damages in a partial takings case. *Id.* at 451. The court concluded that the landowner's inverse condemnation claim was not ripe because the city had not made a final decision on the ordinance's applicability and the landowner had not shown that it would have been futile to seek a final decision. *Id*. at 458-59. The court concluded that the damages for the cost of compliance were "not reasonably foreseeable" but "remote, speculative, and conjecture." *Id*. at 456. There was evidence that the ordinance might not be applicable and that, even if it was, the landowner might be granted a variance so that the improvements would not be required. *Id*. at 456-57.

In contrast, the evidence as to McCarley's remaining land was that the State's drainage system prevented the remainder property from being permitted for development under the

11

City's requirements. Unlike *Coble*, there was no evidence that the City's requirements might not apply to McCarley's remaining land after the taking or that a variance might be granted.[4] On this record, I would conclude that McCarley's claim was ripe for determination in the statutory proceeding.

### 2. *Did McCarley establish the requisite intent?*

The State also argues that the State has sovereign immunity from McCarley's claim because McCarley failed to establish the requisite intent. The requisite intent for a takings claim is present when the governmental entity knows that a specific act is causing identifiable harm or knows that the harm is substantially certain to result from an authorized governmental action. *See Gragg*, 151 S.W.3d at 555; *City of Dallas v. Jennings*, 142 S.W.3d 310, 314 (Tex. 2004). McCarley presented expert testimony that the loss in value in the remainder property was the result of the State's drainage system "as intended." *See Gragg*, 151 S.W.3d at 555 (court draws distinction between design and operation "as intended" and negligence).

There was evidence that the State designed the drainage system knowing that stormwater would back up on McCarley's property. In addition to the evidence that the State designed and constructed the drainage system for a 10-year storm event and the City of Austin requires landowners to develop their land to accommodate a 100-year storm event, there was evidence that the State designed and built a retaining wall to divert water flowing from McCarley's

---

[4] There was evidence that resubmission of the 1998 site plan would have been futile. McCarley's land planner testified that there was nothing that McCarley could do to comply with the City's requirement or to obtain a site permit for development.

12

property away from a nearby school. Although the engineer for the State testified that the wall that was built at the school's property line was a "noise wall," the State's plans referred to it as a "retaining wall." McCarley presented evidence that stormwater from his property would flow toward the school's property, and that the wall at the school's property line was designed to function as a retaining wall to divert water from McCarley's property from flowing on school property during storm events. McCarley's evidence was sufficient to satisfy the requisite intent.

### 3. Did McCarley have a justiciable interest in his claim?

The State argues that because McCarley sold the remaining property in February 2006, he lacks a justiciable interest in his claim. But McCarley owned the property at the determinative time, i.e., at the time of the taking. *See City of Fort Worth v. Corbin*, 504 S.W.2d 828, 830 (Tex. 1974). McCarley was required to present all of his claims for damages that were reasonably foreseeable from the taking. *See Pieratt*, 175 S.W.2d at 246. He, therefore, properly sought his accrued damages due to the drainage system's effect on his remaining property's value. McCarley had a justiciable interest in his claim arising from the drainage system.

I would overrule the State's issues on inverse condemnation.

### Statutory Condemnation Award

The State does not contend on appeal that the question to the jury was an incorrect statement of the law, but argues that there was no competent evidence or, alternatively, insufficient evidence to support the jury's finding that the difference in value of the whole property before the taking and the remaining property after the taking was $371,000. The State contends that the jury's

13

award was improper because evidence of the drainage system's effect on the remaining property's value was incompetent evidence and, because it was the only evidence tendered by McCarley supporting the remainder damages, there was no evidence to support the award. The State argues that the determination of any decreased value should have been limited to the effect of McCarley's loss of the "corner clip" and not the effect of the highway project's drainage system on his remaining property. The State draws a distinction between the alleged damages from the drainage system in its "existing right-of-way" and any damages from the "taking of [the] corner clip." The State argues that it is entitled to judgment based on the only competent testimony of condemnation damages, the value of the part taken as testified to by the State's witness. This issue goes to the compensability of McCarley's damage claim arising from the drainage system, which we review *de novo*. *Santikos*, 144 S.W.3d at 459; *Interstate Northborough*, 66 S.W.3d at 220.

### 1. Compensability of McCarley's claim

In a statutory partial takings case, the property code provides for condemnation damages as follows:

> If a portion of a tract or parcel of real property is condemned, the special commissioners shall determine the damage to the property owner after estimating the extent of the injury and benefit to the property owner, including the effect of the condemnation on the value of the property owner's remaining property.

Tex. Prop. Code Ann. § 21.042(c) (West 2000). Section 21.042 "allows recovery only for the effects of the State's use of the condemned land," which differs from the State's "new use of its existing right-of-way or adjoining land." *Interstate Northborough*, 66 S.W.3d at 219; *State v. Schmidt*,

867 S.W.2d 769, 777-78 (Tex. 1993). The applicable statute also limits compensable damages in a partial takings action by prohibiting recovery for "community damages." Tex. Prop. Code Ann. § 21.042(d).[5]

Consistent with the county court's charge to the jury, statutory condemnation damages to the remainder are calculated by ascertaining the difference between the market value of the remainder immediately before and after the condemnation, taking into consideration the nature of any improvements and the use of the land taken. *See Interstate Northborough*, 66 S.W.3d at 218; *State v. Carpenter*, 89 S.W.2d 194, 197 (Tex. 1936); *see also* 4A-14 Julius L. Sackman, *Nichols on Eminent Domain* § 14.01 (3d ed. 2006).[6] Market value is defined as "the price which the property would bring when it is offered for sale by one who desires, but is not obligated to sell, and is bought by one who is under no necessity of buying it." *Carpenter*, 89 S.W.2d at 202. The "willing-seller

---

[5] Section 21.042(d) prevents recovery for community damages:

> In estimating injury or benefit under Subsection (c), the special commissioners shall consider an injury or benefit that is peculiar to the property owner and that relates to the property owner's ownership, use, or enjoyment of the particular parcel of real property, but they may not consider an injury or benefit that the property owner experiences in common with the general community.

Tex. Prop. Code Ann. § 21.042(d) (West 2000).

[6] The State asserts that none of the drainage improvements that form the basis of McCarley's claim are within the 836 square feet that the State condemned and, therefore, any injury from the drainage system was incompetent evidence in the statutory condemnation proceeding. But there was evidence that the State's design included drainage improvements within the 836 square feet. There was evidence that a drainage pipe and approach ditch to the pipe were within the 836 square feet, that "concrete riprap" was to be built on the condemned portion to prevent erosion, and that the condemned property was to provide an embankment area that would back up water on McCarley's remaining property. In any event, even if the evidence was limited to the State's uses of the 836 square feet, one use was for drainage.

willing-buyer" test of market value considers the factors "which would reasonably be given weight in negotiations between a seller and a buyer." *City of Pearland v. Alexander*, 483 S.W.2d 244, 247 (Tex. 1972) (citing *City of Austin v. Cannizzo*, 267 S.W.2d 808 (Tex. 1954)).[7] Evidence of the factors that "increase or diminish the present market value" is admissible, not as a measure of damages or as a specific item of damage, but to allow the jury to arrive at the correct measure, the "lessened value of the tract." *Carpenter*, 89 S.W.2d at 199-200; *see also City of Sugar Land v. Home & Hearth Sugarland, L.P.*, 215 S.W.3d 503, 512 (Tex. App.—Eastland 2007, pet. denied) (testimony admissible on factors that a "willing buyer" would consider); 7A-G12 Patrick J. Rohan et al., *Nichols on Eminent Domain* § G12.03 (3d ed. 2007) (evidence admissible to show elements of damage that will cause a present diminution in market value of remainder). Admissible evidence includes reasonably foreseeable and probable uses of the affected property. *See Alexander*, 483 S.W.2d at 249; *Cannizzo*, 267 S.W.2d at 815; 4-12B Julius L. Sackman, *Nichols on Eminent Domain* § 12B.12 (3d ed. 2006). It also includes past and probable future injuries. *See Alexander*, 483 S.W.2d at 246-47 (damages include "present and prospective" damages that are the "natural, necessary or reasonable incident of the improvement").

The supreme court has addressed the recovery of damages for the diminution in value to the remaining property in partial takings, placing emphasis on the particular facts and injuries

---

[7] The measure of McCarley's damages is the same whether his claim is classified as an inverse condemnation claim or as part of the statutory condemnation award. *See State v. Schmidt*, 867 S.W.2d 769, 775-76 (Tex. 1993) (rules of recovery generally are the same for inverse and statutory condemnation awards). It is the diminution in value to McCarley's remainder property due to the State's taking under either theory of recovery. *See Tarrant Reg'l Water Dist. v. Gragg*, 151 S.W.3d 546, 557-58 (Tex. 2004) (diminution in value one measure of damages in inverse condemnation).

alleged in determining whether the landowner is entitled to compensable damages for a loss in value. *See Santikos*, 144 S.W.3d at 462-63; *Interstate Northborough*, 66 S.W.3d at 219; *State v. Heal*, 917 S.W.2d 6, 8 (Tex. 1996); *Schmidt*, 867 S.W.2d at 777-79.  In *Schmidt*, landowners sought damages for their remaining property's decrease in market value due to traffic diversion, more circuitous access, decreased visibility, and the inconvenience of the State's construction activities when a portion of their property was condemned as part of a highway project.  867 S.W.2d at 770. The supreme court held the remaining property's loss in value due to the owners' alleged injuries was not compensable because the diminution was the result of the State's use of its existing right-of-way, not from the partial taking, and the damages were community damages.  *Id*. at 776-81.  It was the community-wide change in the highway and not the loss of the strip of property that reduced the remaining property's value.  *Id*. at 778-79, 781.

 Several years later in *Heal*, the supreme court again disallowed property owners' recovery "for the diminution in value of their remaining property not directly attributable" to the partial taking in a condemnation case.  917 S.W.2d at 11.  The court reversed the award of damages, disallowing the owners' claim for "noise damages and other damages incident to the overall effect" of the highway project.  *Id*.  The court held the owners were "not entitled to compensation even if the remainder of their property has lost some degree of value."  *Id*.

 More recently, the supreme court allowed damages for the property's loss in value in a condemnation suit in which the State was acquiring a partial strip of commercial property to widen a highway and its frontage road. *Interstate Northborough*, 66 S.W.3d at 217.  The landowner sought diminution in value damages to the remaining property resulting from the increased proximity

17

to the roadway, with "attendant loss of curb appeal, green space, and 'buffer zone.'" *Id*. The condemnation left the development on the property in violation of a deed restriction and a building setback ordinance. *Id*. at 222. The jury awarded damages for the "decrease in the remainder property's market value, as well as renovation costs to the remainder that the condemnation necessitated." *Id*. at 218. The supreme court upheld the jury award, distinguishing the type of damages that were disallowed in *Schmidt* from the "increased-proximity" damages that affected the "remainder property in a special and unique way." *Id*. at 221-22.

In another recent partial condemnation action, the supreme court, addressing recoverable damages, disallowed recovery for the loss in the remaining property's value when the county took 0.485 acres of land for constructing a frontage road on an existing right-of-way. *Santikos*, 144 S.W.3d at 455, 462-63. The highway project was to raise the roadbed, and the condemned land was to serve as a sloping embankment. *Id*. at 458. The evidence was that the 27-acre tract of raw, unimproved land was in some places five to six feet below the existing highway before the project and that, after the project, the land would be ten to eleven feet below the existing highway's elevation in some places. *Id*. at 457-58. The experts for both sides agreed that the land's best use was as an investment "until population and traffic grew to support development for retail use." *Id*. at 458. The landowner sought damages for the "diminished market perception of the remainder," seeking compensation of "almost $1 million, based mostly on the cost to raise the 3.5-acre tract alongside the embankment." *Id*. at 462-63. The landowner did not claim that the project prevented him from developing his land.

18

The supreme court reversed the jury's award, holding injury from the change in the property's location to below the frontage road not compensable and that the jury should not have considered the elevation change to determine the amount of damages:

> From the proposition that landowners have no right to insist that their premises be visible, it follows that they have no right to insist that they remain at grade level. . . . We hold that any damages resulting from leaving unimproved, raw land in its natural state while raising or lowering an adjacent roadbed in hilly terrain are community in nature.

*Id.* at 463.

With these principles in mind, I would reject the State's argument that McCarley's damages are not compensable. McCarley's injury that forms the basis of his claim for diminution in value to his remaining property from the State's drainage system is comparable to the type of injury the land owners faced in *Interstate Northborough*, which injuries were found to be "special and unique." 66 S.W.3d at 222. The State agrees that the type of injury that McCarley alleges was not "community in nature," and there was no evidence that other properties faced the same type of injury from the State's drainage system. I would hold that McCarley's injury from the diminution in value of his property due to the drainage system was compensable, whether sought as an inverse condemnation claim or as part of the State's statutory claim.

2.      *Sufficiency of evidence at trial*

Both the State's and McCarley's appraisers testified that the appraisal process for valuing vacant land includes determining the property's highest and best use, and that this

19

determination is limited to "legally permissible" uses of the property.[8]  McCarley's site permitting

expert, an engineer with 30 years of experience, including site work for private and public works

projects, was the only witness to testify as to the City of Austin's permit requirements for stormwater

drainage and detention and how those requirements applied to McCarley's property.  He testified that

the State's drainage system precludes the property from obtaining a site development permit because

the system was designed to accommodate only a 10-year storm event and the City of Austin requires

a landowner to show that the property is able to receive and handle upstream flows from a 100-year

storm event.[9]

        The State did not present evidence to dispute McCarley's engineer's testimony on this

issue.  The State's engineer testified that he was not an expert on the City of Austin's requirements

for development:

---

[8] To determine the highest and best use, the testimony was that an appraiser considers four components, "what's legally permissible, what's physically possible, what's financially feasible, and what's maximally productive."  Evidence on development issues is admissible in takings cases as part of an expert's valuation determination and the expert's basis for the highest and best use of property without the necessity of obtaining a definitive decision from the governmental entity involved.  *See City of Austin v. Cannizzo*, 267 S.W.2d 808, 815 (Tex. 1954) (testimony of existence of zoning ordinance that prohibited prospective use admissible and "jury could weigh the effect of the restriction against the prospective use" in determining market value); *City of Sugar Land v. Home & Hearth Sugarland, L.P.*, 215 S.W.3d 503, 511-12 (Tex. App.—Eastland 2007, pet. denied); 7A-G12 Patrick J. Rohan et al., *Nichols on Eminent Domain* § G12.03 (2)(a) (3d ed. 2007); *cf. City of Houston v. Kolb*, 982 S.W.2d 949, 952 (Tex. App.—Houston [14th Dist.] 1999, pet. denied) (regulatory takings claim requires final decision regarding the application of the regulation to the property at issue or showing that futility exception applies).

[9] The State's motion to exclude McCarley's evidence did not seek to exclude McCarley's experts on the basis of relevance, reliability, or qualifications.  *See* Tex. R. Civ. P. 702.  The State's motion was based on the same issues that have been raised on appeal concerning McCarley's inverse condemnation claim—ripeness, requisite intent, and justiciability.

Q.      You've never gone out and actually done a development for a landowner like
        Mr. McCarley.

A.      No, sir.  We never try and skimp and meet the bottom dollar; we just try and
        do the right thing.

Q.      Yes, sir.  You have never taken a development project through the City of
        Austin.

A.      I have not.

Q.      You don't have knowledge as to what the City of Austin requires?

A.      I have some knowledge, but, no, I've never taken a project through.

The State also objected to McCarley questioning the State's engineer on "land planning issues" on

the ground that the questioning was outside the engineer's area of expertise:

I'm objecting because this witness was offered as an expert as a witness on the design
of the facilities of the highway facility.  He's asking him about things having to do
with Mr. McCarley's property that he was not involved in.  So he's going outside of
what he was offered as an expert on.

In sum, the evidence showed that the City of Austin's requirements precluded development of the

remainder property.

McCarley's real estate appraiser testified that because the remaining property could

not obtain a development permit, its use was comparable to a commercial site for outdoor vendor

sales such as Christmas trees.[10]  The State's real estate appraiser confirmed that when a vacant lot

---

[10] The parties disputed which properties were included in the condemnation proceeding.
McCarley's experts included both Lot 1 and Lot 2 in their valuation determinations, and the State's
experts only included Lot 1.  There was evidence supporting a damage award based on both lots.
*See State v. Windham*, 837 S.W.2d 73, 77 (Tex. 1992)  (landowner ordinarily has right to damages
to the "entire remainder provided it is contiguous and there is unity of use").

is being appraised in the "Austin/RoundRock market, entitlements are very important things that [appraisers] have to look at: zoning, platting, site plans, those kinds of things." Although he assumed for purposes of his appraisal that the remaining property could be permitted, he testified that the property's value would be adversely impacted if it could not get a site development permit:

Q. What we're really concerned about in the regulatory climate of the City of Austin is whether we can get a site development permit for the property, right?

A. For the remainder, sure. Well, and the whole, yes.

Q. Because if you can't get a site development permit, you can't develop any permanent improvements on the property, right?

A. True.

Q. And [Lots 1 and 2 are] not worth very much if you can't get a site development permit, are they?

A. That's true.

\* \* \*

Q. You do agree that that's the key inquiry is whether or not you could get a permit from the City?

A. It would be—The presumption of my remainder appraisal is that you could.

Q. And you went through the four steps of highest and best use. If you can't get it legally permitted, you can't build it, and it's not the highest and best use, right?

A. True.

The trial court instructed the jury to consider the highest and best use. The jury properly considered the evidence of probable uses that would be legally permissible before and after

22

the taking in deciding the ultimate issue of market value. *See State v. Windham*, 837 S.W.2d 73, 77 (Tex. 1992). Based on the evidence, the jury could have reasonably decided that the highest and best use for the property prior to the taking was commercial development, that the highest and best use after the taking was "outdoor vendor sales," and that the remaining property's value had been significantly decreased by the State's condemnation and drainage system. It was within the jury's province to resolve the conflicting evidence on value in McCarley's favor and to disregard the State's argument that there was no diminution in value to the remaining property from the condemnation. I would conclude the jury's award was within the range of the evidence and that the evidence was competent and sufficient. For these reasons, I concur in the majority's decision to affirm the judgment of the county court.

_____

Jan P. Patterson, Justice

Before Justices Patterson, Puryear and Pemberton

Filed:   December 20, 2007

23