**AFFIRMED and Opinion Filed December 3, 2019**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-17-01385-CV

**THE MIAN DEVELOPMENT CORPORATION, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the County Court at Law No. 5**
**Dallas County, Texas**
**Trial Court Cause No. CC-14-03073-E**

## MEMORANDUM OPINION

Before Justices Whitehill, Molberg, and Reichek
Opinion by Justice Whitehill

On our own motion, we withdraw our July 18, 2019 opinion. This is now the opinion of the court.

This condemnation case concerns a more than forty-year old hotel along Highway 183 in Irving, Texas. The State condemned a portion of the hotel's front parking spaces for a highway expansion but none of the hotel's three buildings. The jury awarded the property owner, Mian Development Corporation, a total of $1,186,350 for both the land taken and damages to the remaining property.

The dispute focused primarily on the second calculation, and that debate was heavily influenced by conflicting opinions regarding whether the hotel would be viable post-taking. Mian's owner, its two appraisal experts, and even the State's hotel data expert testified that the taking rendered the remaining hotel unviable; whereas, the State's appraisal experts testified that

the hotel had a remaining useful life of at least five years. The jury's verdict in this contest between battling experts more closely aligned with the State's experts' opinions. Accordingly, this appeal concerns the admissibility of the State's experts' opinions.

In four issues, Mian argues that (i) the trial court erroneously admitted testimony from three of the State's expert witnesses, two of whom Mian called as adverse witnesses in its own case in chief; (ii) the erroneous admission of the experts' testimony violated its constitutional rights to a jury trial, just compensation, and due process; (iii) the trial court erred by denying its motion for new trial; and (iv) cumulative errors require reversal. Because Mian does not contend that the State's experts were unqualified, the admissibility issue turns on whether their opinions were relevant and based on reliable valuation methods and underlying data. Both side's experts used one or more of the same valuation methods and much of the same supporting data.

Based on the issues and arguments Mian asserts and the record before us, we conclude that Mian has not shown that the rulings were an abuse of discretion. Therefore, Mian's constitutional rights to a jury trial, due process, and just compensation were not violated. Likewise, the trial court did not err by denying the motion for new trial because: (i) the evidence is sufficient to support the judgment; (ii) there was no abuse of discretion in allowing the State's experts to testify; and (iii) Mian was not deprived of the opportunity to cross-examine the State's experts. Because there was no error, there was no cumulative error. We thus affirm the trial court's judgment.

## I. BACKGROUND

Before the taking, Mian owned a 4.3576 acre property on which the Sterling Hotel and garage are located (the Property). The Sterling has three buildings: a twelve-story full-service hotel tower with 360 rooms; an adjoining building in which the hotel lobby, restaurant, and common areas are located; and a five-story parking garage.



In 2014, the State filed a petition for condemnation seeking to take a 24,290 square foot parcel of the Property for its plan to widen State Highway 183, including some of the Sterling's parking spaces and landscaping. The taking also entails moving the new right-of-way line within three feet of the Sterling parking garage.

Special commissioners awarded Mian $3,499,999. Both parties objected to the award and both disagreed about the Property's market value before the State's acquisition. The parties agreed to set aside the Commissioners' conditional order granting a writ of possession and the case was set for a jury trial.

At trial, Mian argued it should be compensated for the Property and the values of the improvements because the taken portion rendered the remaining property unviable. That is, Mian argued that its damages were the hotel's value before the taking minus zero dollars for a total loss. To this end, Mian offered two appraisal witnesses, Josh Korman and Peter Malin, who testified that the total compensation due to Mian was $13,600,101 and $19,100,000, respectively.

On the other hand, the State's appraisal witnesses, Matthew Browne and Alan Pursley, testified that the compensation owed to Mian was $1,027,927 and $764,970, respectively. Both experts opined that the Sterling had some continued viability. Thus, their damages models measured the hotel's pre-taking value less its post-taking value. Mian called Brown and Pursley as its second and third witnesses in its case in chief.

Bruce Walker, a hotel expert, also testified for the State and opined that the Sterling was unsustainable.

The jury was asked to determine the value of the land taken and the damages to the remainder due to the taking and found, (i) the fair market value of the taking was $286,350 and (ii) the damages to the remaining property were $900,000. The trial court entered judgment on this verdict. Mian then moved for a new trial, which the trial court denied.

The following chart summarizes the evidence regarding the (i) pre-taking values of, and damages to, the remainder property and (ii) jury's related damages finding:

| Method | Mian | Korman[1] | Malin[2] | Browne[3] | Pursley | Jury |
|---|---|---|---|---|---|---|
| Income | NA | $13,315,033 | $19,255,000 | $3,883,609 | NA | NA |
| Comparable Sales | NA | $13,274,573 | $19,425,000 | $3,769,524 | NA | NA |
| Cost | NA | $13,014,275 | 18,075,000 | $3,489,535 | $4,911,985[4] | NA |
| Agreed Tax Valuation | $2,550,000 | — | NA | NA | NA | NA |
| Damages to Remainder | NA | Total Loss | Total Loss | $804,451 | $0[5] | $900,000 |

[1] Mian Ex. 99 minus $405,427 per Mian Ex. 100.

[2] Mian Ex. 151 minus $375.000; 13 RR18.

[3] State Ex. 33 minus $223,476 from State Ex. 32; 11 RR 35.

[4] State Ex. 65; 5 RR 87.

[5] Although Pursley did not offer a traditional diminution in value opinion regarding the remainder property, he did offer a $764,970 amount to remedy the parking situation.

## II. ANALYSIS

**A.     First and Second Issues:  Did the trial court abuse its discretion by admitting the expert testimony, thereby infringing Mian's constitutional rights?**

Mian argues that Walker's, Browne's, and Pursley's expert testimony should not have been admitted.  According to Mian, these allegedly erroneous evidentiary rulings infringed on its constitutional rights to a jury trial, due process, and just compensation. [6]  We reject these arguments because the record contains evidence from which the trial court could have reasonably found that the experts' opinions related to disputed issues, used accepted methods, and were based on reliable data.  And the record does not establish that the experts' analysis contained analytical gaps.

### 1.     Standard of Review and Applicable Law

The trial court is the "evidentiary gatekeeper" responsible for excluding irrelevant and unreliable expert evidence.  *Exxon Pipeline Co v. Zwahr*, 88 S.W.3d 623, 629 (Tex. 2002).  It has broad discretion to determine the admissibility of evidence, and we will reverse only for an abuse of that discretion.  *Id*

An expert's testimony is admissible if the expert is qualified to testify about "scientific, technical, or other specialized knowledge" and the testimony is relevant and based upon a reliable foundation.  TEX. R. EVID. 702; *TXI Transp. Co. v. Hughes*, 306 S.W.3d 230, 234 (Tex. 2010).

Expert testimony is unreliable if it is based on unreliable data or if the expert draws conclusions from his underlying data based on a flawed methodology.  *Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 39 (Tex. 2007) (quoting *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 714 (Tex. 1997)).

---

[6] The State argues Mian waived these arguments by calling the State's appraisal experts in its case-in-chief.  Because the result is the same as if there were a waiver, we assume no waiver and address the substance of Mian's issues and arguments.

Testimony may also be unreliable if there is "too great an analytical gap between the data the expert relies on and the opinion offered." *Zwahr,* 88 S.W.3d at 629. In applying this reliability standard, the trial court does not decide whether the expert's conclusions are correct; rather, it determines whether the analysis used to reach those conclusions is reliable. *Gammill v. Jack Williams Chevrolet*, 972 S.W.2d 713, 727 (Tex. 1998).

Unreliable expert testimony is legally no evidence, *Seger v. Yorkshire Ins. Co.*, 503 S.W.3d 388, 410 n.23 (Tex. 2016), and it is an abuse of discretion to admit such testimony, *see Gharda USA, Inc. v. Control Sols., Inc*., 464 S.W.3d 338, 347–48 (Tex. 2015).

### 2.    Bruce Walker

#### a.    Introduction

Walker is not a real estate appraiser; he is instead an expert on hotel valuation. Rather than giving a valuation opinion as such, Walker provided background testimony that educated the jury or related to the value calculations. His testimony was significant to this case because, contrary to Mian's experts, it tended to lower the hotel's pre-taking value and to increase the hotel's post taking value. As to the hotel's continued viability pre-taking, Walker walked a fine, line falling just short of unequivocally stating that hotel was not viable pre-taking.

Mian argues that the trial court erred by denying its expert challenge to Walker because: (i) Walker relied on the Sterling's actual financials and valued the existing operation; (ii) even if using the existing financials was a correct methodology, Walker ignored the existing financials and formulated his own financial projections; (iii) Walker offered no evidence of income for the years he rejected; (iv) Walker incorrectly identified the two zip codes around the Sterling as the market; and (v) Walker's data did not assist the jury with understanding the evidence or determining an issue.

Significantly, however, the court excluded the evidence Mian challenged in its first three arguments. And while Mian generally complains that the court excluded the objected-to data but allowed unreliable opinions about the data, the record reflects that the data was excluded and Walker did not opine about the excluded data.[7] Therefore, we consider only whether Walker's methodology was unreliable and whether his testimony was relevant to determining the damages that the taking caused to the remainder portion.

### b.    Walker's Testimony Generally

Walker testified generally about the Sterling's location, size, age, and branding (or lack thereof). He defined and explained certain terminology for the jury, including average daily rate or ADR (the average price the hotel charged the customer for the relevant time period), occupancy rate (the number of rooms sold divided by the number of rooms available), and RevPAR (total revenue for selling rooms divided by the number of rooms available.)

Walker examined data for the Dallas County hotel market for 2014, and found an occupancy rate ranging from 66-72%, an ADR of $79-$83, and RevPAR from $52.99-$59.84. This market showed "pretty strong growth" percentages ranging from 4-6%.

### c.    Zip Codes

Walker also analyzed the lodging market for two zip codes, 75247 and 75062, around the Sterling. His analysis covered the years 2011-2014, and excluded the Sterling itself. Walker referred to this as the "local market."

Comparing this market to the Dallas County market showed "significantly lower production," with approximately $55 RevPAR in the Dallas market and $47 RevPAR in the local

---

[7] Likewise, Mian complains that by excluding the data but allowing the testimony, it was deprived of the right to cross-examine Walker. But Mian does not identify any specific testimony nor have we found any pertinent to the excluded data. Therefore, we need not address this argument.

market (a 14.5% difference). Walker thus concluded that the local market "doesn't appear to be a very good market."

Mian contends that Walker provided no information about why he chose the two zip codes to define the local market or whether they were comparable to the Sterling's market. But Walker specifically testified that the local market was representative of the Sterling's market area and that this is the market that competes with the Sterling.

Moreover, Mian's appraisers both focused on properties in these two zip codes. Korman looked at seven comparable properties and Malin at fourteen properties, and for each, five of the comparable properties were in the zip codes Walker used. Matthew Browne, one of the State's appraisers, also relied on comparable properties from this market area.

### d. Averaged Data

Mian also complains that Walker only averaged the market data presented to the jury. The record reflects, however, that Walker provided hotel-by-hotel underlying data in addition to the market averages of ADR, occupancy rate, and RevPAR. Contrary to Mian's suggestion, Walker did not testify that the Sterling's value was the average of the market data. Moreover, Mian's expert also considered the average performance of hotels in the market area.

### e. Hotel Size and Age

Walker opined that the Sterling is too large for its market, and said that "larger hotels have closed very significantly if they're not in the downtown area." Thus, according to Walker, the Sterling "is in jeopardy" because of its size and location. Walker further noted that the Sterling is forty years old and "the odds of it surviving five years are extremely low."

### f. Branding

Walker explained the significance of a hotel's brand. He looked at the hotels in the local market and compared the 2014 RevPAR for independent hotels with chain hotels with a recognized brand.

The branded hotels had $49.41 RevPAR and the independents had $27.57. Walker explained that this result is consistent with the hotel market in Texas generally. Independent hotels are only 14 percent of the hotel revenues in the state, and those that have brands are doing "extremely well." On the other hand, the low priced independents "are on their last legs." He explained that he calls those independent hotels "notel motels - - - and they can't get a brand." Walker therefore opined that the Sterling cannot survive without being branded.

Mian insists that Walker's opinions consisted of "bare conclusions lacking any supporting basis."[8] According to Mian, the jury was told that "the Sterling was unsustainable simply because Bruce Walker says it is." But the record reflects otherwise. Walker's conclusion was that, viewing all of the characteristics that he described—location, size, age, and lack of branding—the Sterling is "not sustainable." We therefore reject Mian's argument that the testimony was conclusory.

### g. *Morale*—Displacement

Mian also argues that Walker's testimony is similar to testimony offered in *Morale v. State*, 557 S.W.3d 569, 575–76 (Tex. 2018). We disagree.

In *Morale*, the State planned to condemn a portion of a 33,000 square-foot property for improving FM 720. The property was improved with an 8,831 square-foot building used for a vehicle and collision repair business. The State planned to take a 3,200 square-foot strip of land, which included a metal canopy that would have to be demolished.

---

[8] Mian also contends that Walker relied on his own income projections to conclude that the Sterling was not viable. But Walker did not offer any testimony based on income projections; that data was excluded.

The State's appraiser concluded that the business could still be used as an auto repair shop after the taking, but not as a collision repair shop. Because the property's use would change, the State classified the property owners as "displaced," which would mean that they would be unable to conduct business in the same or similar manner as prior to the acquisition. *Id*. at 572. But the State's land planner subsequently developed a second plan for the property's continued use as a collision repair shop. Thus, the State revoked the property owners' displacement status. The difference meant whether the subtrahend in the value before and post-taking calculation was zero dollars or had a positive value.

At trial, two State's experts suggested that the property owners might be given a zoning variance to allow the property owners to continue the collision repair business in a nonconforming way. Both experts conceded, however, that they could not testify about whether such a variance would actually be granted. The trial court excluded this testimony as irrelevant. But the court admitted testimony from two other experts discussing displacement. The court of appeals reversed and remanded, holding that the displacement evidence was irrelevant and harmful. *Id*. at 573.

Considering whether the displacement evidence was admissible, the supreme court held that, "expert testimony in condemnation cases is inadmissible if it relates to 'remote, speculative, and conjectural uses' of the property that 'are not reflected in the present market value of the property.'" *Id*. at 575–76 (citing *State v. Schmidt*, 867 S.W.2d 769, 773 (Tex. 1993)). The court qualified, however, that "an expert's opinion may assume facts established by legally sufficient evidence." *Id*. at 575. Finally, the court held that the testimony was admissible because the expert's assumption that the property owners could not continue the property's existing use was grounded in evidence and "did not improperly assume facts with an insufficient evidentiary basis." *Id*. at 575–76. To that end, the court said, ". . . the State was free to cross-examine [the expert] on his assumptions, but they did not render his testimony wholly speculative and therefore

–10–

inadmissible." *Id*. at 576. On the other hand, the court concluded that the expert testimony concerning zoning variances was sufficiently speculative that it was within the trial court's discretion to exclude it. *Id*.

Likewise, the record reflects that Walker's opinions were grounded in legally sufficient evidence (that was not excluded). Walker opined that the Sterling was not sustainable based on examination and comparison of Texas-wide data, Dallas County data, and local market data. Significantly, he did not conclusively state that the Sterling would definitely go out of business. Instead, he offered an opinion concerning the likelihood of its continued viability apparently both before and after the taking. *See e.g., State v. Little Elm Plaza, Ltd*., No. 02-11-00037, 2012 WL 5258695, at *12–14 (Tex. App.—Fort Worth Oct. 25, 2012, pet. dism'd) (mem. op.) (experts may testify about how an uncertainty regarding governmental action may affect market value but may not opine on how the uncertainty will actually be resolved).

Walker's testimony was also relevant to the market value determination, as evidenced by the fact that both side's appraisal experts relied on his data in whole or in part. For example, Korman and Malin used Walker's Texas Hotel Performance Factbook for comparable hotel data. Similarly, Browne relied on "a lot of" Walker's data. And Pursley relied on Walker's data concerning the Sterling's location, age, size, and lack of recognized brand.

Given the foregoing, we conclude that Walker's opinions are based on reliable methodology and are sufficiently grounded in the evidence. There is no gap in his testimony because he fully explained the factual bases for his conclusions.

Because Walker's opinions were reliable and relevant to the market value determination, it was the type of expert testimony the trial court could reasonably have concluded would assist the trier of fact. *See K-Mart Corp. v. Honeycutt*, 24 S.W.3d 357, 360 (Tex. 2000) (expert testimony

–11–

assists trier of fact when knowledge on relevant issue is beyond that of average juror). Therefore, the trial court did not abuse its discretion by admitting Walker's testimony.

### 3. The State's Appraisers

#### a. Introduction

Mian also argues that the trial court should have excluded the testimony of the State's appraisers, Browne and Pursley, because they used flawed appraisal methodology and relied on Walker. Mian further asserts that the trial court deprived it of the right to cross-examine these experts by excluding certain data they relied on but nonetheless allowing them to testify. We begin by examining the experts' methodology.

Both the United States and Texas Constitutions require governments to compensate landowners for takings of their property for public use. U.S. CONST. amend. V (requiring "just compensation"); TEX. CONST. art. 1, § 17 ("adequate compensation"). "Compensation for land taken by eminent domain is measured by the fair market value of the land at the time of the taking." *City of Sugar Land v. Home and Hearth Sugarland, L.P.*, 215 S.W.3d 503, 511 (Tex. 2007). Thus, a fundamental damage issue in the typical condemnation case is how to measure the condemned property's market value.

Market value had two applications in this case. One was the market value of the taken parcel, which is not challenged on appeal. The other is the remainder's market value before and after the taking as that difference affects the damages the taking caused to the remainder property.

"Market value is defined as the price the property would bring when offered for sale by one who desires to sell but is not obliged to do so and bought by one who desires to buy but is under no necessity to do so." *City of Sugar Land*, 215 S.W.3d at 511.

"In the 'willing seller—willing buyer test' of market value, all factors should be considered that would reasonably be given weight in negotiations between a seller and a buyer." 215 S.W.3d at 512.

"In determining market value, the jury may consider all uses for which the property is reasonably adaptable and for which it is (or in all reasonable probability will become) available within the foreseeable future." *Id*. at 511.

The three traditional approaches to determining market value are the (i) comparable sales, (ii) cost, and (iii) income methods. *Religious of the Sacred Heart v. City of Houston*, 836 S.W.2d 606, 615–17 & n.14 (Tex. 1992).

"When only a part of a tract is taken, as here, the landowner is entitled to (1) the fair market value of the part taken and (2) any damage to the remainder as a result of the taking." 215 S.W.3d at 514. Determining the remainder property's fair market value "requires measuring the difference between the value of the property immediately before and after the taking. *Id*.

Appraising property is not an exact science based on set mathematical formulas. *Harris Cnty. App. Dist. v. Kempwood Plaza, Ltd*., 186 S.W.3d 155, 161 (Tex. App.—Houston [1st Dist.] 2006, no pet.). Consequently, Texas courts have a wide degree of latitude when determining admissibility. *Id*. at 162.

Like expert testimony on any other matter, an expert appraisal witness in a condemnation case must not only be qualified, but his or her testimony must be relevant and based upon a reliable foundation. *Guadalupe-Blanco River Auth. v. Kraft,* 77 S.W.3d 805, 807 (Tex. 2002).

The owner has the burden to establish fair market value. *See City of Sugar Land,* 215 S.W.3d at 514. Texas courts have long recognized that the question of market value is "peculiarly one for the fact finding body." *Texas Pipeline Co. v. Hunt*, 228 S.W.2d 151,156 (Tex. 1950).

Here, the crux of Mian's complaint about the State's appraisers concerns the methodology they used to measure the property's remaining market value after the taking.

### b.    Browne

### (i)    Introduction

Browne is a licensed real estate appraiser and MAI.[9] He has appraised all types of properties, including hotels, and the majority of his work is in condemnation cases.

Browne appraised the Property three separate times. His final appraisal, presented at trial, (i) was based on market data, his review of other area hotels' performance, and conversations with brokers and (ii) concluded that the Sterling's highest and best use was continuing as a long-term guest hotel because the Sterling was nearing the end of its economic life. His inspections confirmed this: he found numerous areas of deferred maintenance; dated appearance, designs, and repair; and a stale odor throughout the hotel.

Browne used the cost approach, comparable sales, and the income approaches to value the Sterling in light of its highest and best use.[10] In his last appraisal, he ultimately recommended total damages of $1,027,927 (property taken plus damage to the remainder), based on finding 363 viable rooms and a usable parking garage. He first offered this testimony when Mian called him as an adverse witness to testify in its case-in-chief.

Mian argues that Browne's testimony should have been excluded because: (i) he used flawed methodology in his "HBU analysis"; (ii) his opinions and data employed improper methodology because he used the Sterling's actual financials to calculate market value; (iii) he relied on Bruce Walker; (iv) the court struck his unreliable data so he had no support for his trial

---

[9] MAI stands for Member of the Appraisal Institute, which is the highest designation one can achieve in the Appraisal Institute.

[10] The cost and sales comparison approaches are not at issue. Browne valued the Property at $3,713,011 using the cost approach and $3,993,000 using the sales comparison approach.

opinions; and (v) Mian was unable to cross-examine him because the trial court struck his underlying data.

### (ii) Highest and Best Use

We begin with Browne's HBU testimony. Mian complains that this analysis is flawed because Browne did not utilize the accepted definition of market value in determining the Sterling's HBU. We disagree.

In determining market value, the jury considers the condemned property's highest and best use. *Enbridge Pipelines, L.P. v. Avinger Timber, LLC*, 386 S.W.3d 256, 261 (Tex. 2012). When the property's highest and best use is disputed, the jury decides which use is appropriate. *State v. Windham*, 837 S.W.2d 73, 76–77 (Tex. 1992). The four factors considered when determining a property's highest and best use are: (i) legal permissibility, (ii) physical possibility, (iii) financial feasibility, and (iv) "maximal productivity." *City of Sugar Land*, 215 S.W.3d at 511. Browne identified these factors and explained how he used them to reach his conclusion that the Sterling's highest and best use was continued use as a long-term hotel.

Further, Browne's report states that the appraisal's purpose is to determine the Property's fair market value defined as:

> The price the property would bring when offered for sale by one who desires to sell but is not obligated to sell, and is bought by one who desires to buy, but is under no necessity of buying, taking into consideration all of the uses to which it is reasonably adaptable and for which it either is, or in all reasonable probability, will become available within the reasonable future.

This comports with the generally accepted definition of market value. *See Sharboneau*, 48 S.W.3d at 182.

Because Browne used the accepted fair market value definition, followed the appropriate steps for determining highest and best use, and supported his opinions with market data, we reject Mian's premise that Browne's HBU determination utilized improper appraisal methodology.

–15–

### (iii)    The Sterling's Actual Financial Information

Next, we consider Browne's use of the Sterling's actual financials.  Mian argues that Browne "makes the Sterling's income the basis of his income approach," and contends that it is inappropriate to compute market value based on a business's income.  We reject that argument because the actual financials were only one data set in the overall analysis.  Moreover, Mian views Browne's use of the Sterling financial data out of context.[11]

To start, Browne used the income approach to determine the Sterling's market value.  The income approach consists of estimating a property's future income and applying a capitalization rate to determine the property's present value.[12]  *Sharboneau*, 48 S.W.3d at 183.  The income approach is particularly appropriate when a hotel would be valued on the open market according to the amount of income it already generates.  *State v. Bristol Hotel Asset Co.*, 293 S.W.3d 170, 172 (Tex. 2009).

Next, Browne testified about the income approach, which is further detailed in his report.  There, Browne uses four comparable properties to determine the variables for his income approach: ADR, occupancy rate, and RevPAR.  The four comparable properties, the Super 8, the Park Inn, the Dallas Love Field Ramada Inn, and the MCM Elegante were also used as comparables by Mian's expert.  These properties showed an ADR between $21.50 and $47.86.  Browne used a $23 ADR because the Sterling was at the end of its economic life.  He estimated an 80% occupancy rate and reviewed market data to determine expenses.

---

[11] Mian cites numerous cases concerning the unavailability of lost profits damages in condemnation cases to argue that Browne's testimony regarding the Sterling's actual financial data was irrelevant and should not have been allowed..  *See, e.g., State v. Cent. Expressway Sign Assocs.*, 302 S.W.3d 866, 871 (Tex. 2009) (advertising revenues from billboards inadmissible to value sign site lease); *City of Austin v. Ave Corp.*, 704 S.W.2d 11, 13 (Tex. 1986) (denying landowner's lost profits request); *City of Dallas v. Priolo*, 242 S.W.2d 176, 179 (Tex. 1951) (excluding testimony about lost business).  As Mian acknowledges, however, this case does not involve lost profits or access denial claims.  Thus, the lost profits line of cases do not control our analysis.

[12] The capitalization rate is defined as the rate of interest investors would require as a return on their money before they would invest in the income-producing property, taking into account all the risks involved in that particular enterprise.  *Polk County v. Tenneco, Inc.*, 554 S.W.3d 918, 921 (Tex. 1977).

Then, to determine the capitalization rate, Browne talked to brokers and reviewed his sales data. The Park Inn sold on a 24% capitalization rate. Using this data set with other market data, Browne estimated a 20% capitalization rate for the Sterling. Applying that rate yielded a $4,107,085 value. Browne therefore concluded that the whole property was valued at $4,000,000, which was a higher value than his first two appraisals.

Finally, although Browne's report refers to the financial data Mian provided in discovery, it is only one data set in his analysis. As Browne explained, there were discrepancies in the data Mian provided in discovery and the data it provided to the Comptroller for tax purposes. Consequently, in computing ADR, Browne also relied on market data and an ADR rate above the rate Mian reported. Although that ADR market estimate was below the average of comparable properties, because he appraised the Sterling as a long-term tenant hotel rather than an overnight hotel, occupancy rates and RevPAR were above what Mian reported to the Comptroller. Browne's market estimate conclusions were based on his HBU analysis and the comparable properties he examined. Thus, contrary to Mian's assertions, Browne's opinions were not "based on or inextricably tied to Mian's financials."

### (iv)  Relying on Walker

Mian's argument that Browne's opinions should have been excluded because he relied on Walker are similarly unpersuasive. This argument rests on Mian's premise that Walker's data is unreliable. We have concluded otherwise. Therefore, there was no basis to exclude Browne because he relied on Walker.

### (v)  Excluded Evidence

Finally, Mian argues that the trial court struck Browne's "unreliable data," so he had no basis for his trial opinions, and striking this data precluded Mian from cross-examining him. Specifically, Mian argues that:

Most of the evidence heard by the jury was expert testimony. The error made by admitting unreliable expert testimony constitutes reversible error. The error was amplified by evidentiary rulings on the data underlying the State's experts. Specifically, the trial court excluded the unreliable data used by the State's experts, *but then* allowed them to testify to opinions based on the unreliable data. The data ruling prevented Mian from fully cross-examining the State's experts to demonstrate to the jury the flaws in the State's experts' opinions.[footnote omitted] In essence, the trial court's contradictory rulings (excluding the data, but allowing the unreliable opinions) handcuffed Mian and prevented Mian's counsel from presenting the jury with a full picture of the unreliability the State's expert's position.

(emphasis added). Mian makes similar arguments regarding Pursley, so we address together its arguments regarding both witnesses and the subject "data."

Mian's argument concerns three categories of documents that Mian now says it should have been allowed to ask Browne and Pursley about. Those categories include (i) DCAD records showing tax protest values Mian agreed to, (ii) Internet reviews of the Sterling, and (iii) Dallas Police Department crime reports regarding the Sterling.

Mian's argument fails because it presents the sequence of events backwards, ignores the fact that Mian—not the State—asked the trial court to exclude the documents that Mian rests its argument on, and omits other important facts. In short, the trial court did not prevent Mian from cross-examining the State's experts about those documents, Mian chose not to do so.

More specifically, Mian filed *Robinson* motions to exclude Browne's and Pursley's opinions, arguing generally that the testimony was unreliable.[13] But neither of those motions argued with specificity what Mian thought made those opinions unreliable. Mian did not obtain a pre-trial hearing or ruling on those generic motions. Instead, the trial court signed orders denying them on the last day of evidence. The record, however, does not show whether that happened before the evidence closed.

---

[13] A *Robinson* motion challenges the admissibility of an expert witness's opinions. *See E.I. du Pont de Nemours and Co., Inc. v. Robinson*, 923 S.W.2d 549, 557 (Tex. 1995).

Next, Mian filed pre-trial limine motions regarding the subject documents. The motions argued that Internet reviews and police reports were "irrelevant to any issue in the case, and constitute hearsay within hearsay without a permissible exception." Mian also argued that the police reports would be prejudicial and misleading and the Internet reviews were anonymous and unauthenticated.

Later, when arguing the limine motions at the pretrial hearing, Mian urged the court to grant the limine motions because the State's appraisers did not rely on that evidence. Specifically, Mian argued:

> Mr. Pursley said he made a cost approach only. He said that he did not use the information and cannot quantify or qualify how the information was used, if at all in his- - in his appraisal. . . I said, what percent valuation was done? Can't answer that. Can't put any qualitative or quantitative analysis of how I used it.

> Mr. Browne appraised this property two times . . . and then he appraised it for what he calls his trial appraisal. We went in and said, Did you use the Internet and the information that the attorney general gave you? Oh yes, I used it. How did you use it? Well, I can't - - I can't really tell you how it's just used. . .

> [t]hey're saying Yes, I considered it, but I can't tell you how. . . And - - and so you throw that in the jury box and . . . it can be nothing but prejudicial.

The trial judge said, "We'll keep out pure conclusions not based on anything. But the general rule is that an expert can rely on hearsay . . . ." Additionally, when ruling on the limine motions, the judge remarked:

> So I guess the motion in limine is sustained. But if his testimony on direct examination is - - and if we have to do it outside the presence of the jury, we will - - that I relied on police reports and such - - and that would make sense if he did - - I can understand that's something somebody would look at in appraising a piece of property.

The court's limine rulings meant only that—at Mian's urging—the data could not be presented to the jury without first seeking the court's permission. *See Fort Worth Hotel Ltd. P'ship v. Enserch Corp.*, 977 S.W.2d 746, 757 (Tex. App.—Fort Worth 1998, no pet.). It was not a ruling that the evidence necessarily would be excluded if offered later.

Next, Mian opened the evidence and called Browne and Pursley as its second and third case in chief witnesses. Mian asked them both about their opinions and their bases. But it did not attempt to ask either one about the subject documents. Nor did it object that their cross-examinations were somehow impaired by the limine ruling it requested.

Rather, when Browne's testimony concluded, the State made an offer of proof regarding the Dallas Police crime reports. The court ruled that the objection was "still sustained." But Mian did not make its own offer of proof to demonstrate the cross-examination it now says it could not present because the evidence was excluded.

Also during Mian's case in chief, the State sought to cross-examine Mr. Mian about Mian's tax protest documents. But Mian objected, and the trial court sustained that objection.

Later, the State called Browne and Pursley in its case. Again, Mian did not try to ask either one about the exhibits it now says were crucial to cross-examining them. Nor did it complain that its second chances at Browne and Pursley were impaired by an inability ask them about the subject documents.

Still later, the State made an offer of proof through Pursley regarding the subject exhibits. Mian again objected to admitting them. The State asked Pursley about his use of the Dallas Appraisal District documents and whether he relied on them in forming his opinion. Pursley replied, "To some extent." When the State asked him to explain, Pursley said:

> There was a couple of things. One, it really brought to my attention that there was a disconnect in the financials that I had received, because the numbers that were provided in that report didn't seem to shake hands with the numbers that were provided to me. The other thing was that there was some discussion on how many down rooms there were or floors that had been shut down and that kind of thing, and that was something that I, *to some extent*, considered.

(Emphasis added).

The State also asked him about the Trip Advisor and Yelp reviews Pursley read and their impact on his appraisal. Pursley responded that:

It confirmed that the hotel, overall, is kind of operating at a level below market standard. And so there was, I would say, more negative reviews . . . It just kind of gave - - it also fed into my thoughts that it was near the end of its economic life and the standards of the hotel were - - were not as high as the typical market.

The trial court sustained Mian's objection and for the first time ruled that two document categories (Internet reviews and police reports) would be excluded. The trial court also reaffirmed its prior ruling—in response to Mian's earlier objection—that the third document category (documents related to Mian's prior property tax protests) would be excluded.

That is, the trial court agreed with Mian's pre-trial argument—that the evidence concerning the Internet reviews, DCAD records, and police reports should be excluded because the experts did not rely on them. However, Mian now seeks to advance the opposite argument—that the experts relied on the data; thus, their testimony should have been excluded, or at least Mian was denied the ability to cross-examine them about it.

Stated differently, Mian complains that it was denied a constitutionally protected right to cross-examine Brown and Pursley about evidence Mian successfully excluded and the witnesses did not rely on to any measurable extent—even though the trial court never denied a Mian request to ask them about that evidence.

Although Mian heard the State's offer of proof through Pursley, it did not cross-examine him about the documents. And it did not ask to question Pursley or Browne about the documents in a rebuttal case. Nor did make its own offers of proof showing what cross-examining Browne or Pursley about the subject documents would have revealed for us to review on appeal.

In sum, Mian successfully thwarted the State's efforts to introduce the same documents that Mian for the first time in a new trial motion argued that it—Mian—should have been allowed to question Browne and Pursley about. All of this happened without Mian ever attempting to ask either witness about any of the excluded documents before the jury or in an offer of proof.

Mian's argument presents several deficits.

–21–

First, the trial court did not deem the data "unreliable." Mian argued for exclusion because the experts did not rely on the evidence and other bases under the rules of evidence. Indeed, at least regarding the police reports, the court's limine ruling suggests that a reliability challenge would likely have failed.

Second, the State made the offers of proof, not Mian. Mian did not try to cross-examine the witness during the State's proffers, nor did it tell the trial court that excluding the data would impair its ability to cross-examine any witness. That is, Mian never made an offer of proof concerning its allegedly impaired ability to cross-examine the experts. *See In re Bertucci*, -S.W.3d-, No. 03-19-00245-CV, 2019 WL 5280988, at *3 (Tex. App.—Austin Oct. 18, 2019)(Orig. Proceeding) (one can preserve denial of right to cross-examine with an offer of proof or bill of exception); *see also* TEX. R. EVID. 103(a)(2) (offer of proof); TEX. R. APP. P. 33.2 (bill of exception). Thus, it cannot now complain that it was deprived of the "gold mine for [its] vigorous cross-examination."

Third, Browne testified (out of the jury's presence) that he could exclude [the police reports, internet reviews and tax records] and "would still come up to a very similar number." Pursley's testimony reflects that the data reinforced opinions he had already formed and he considered it "to some extent."

Fourth, because Mian asked that the evidence be excluded, it cannot on appeal complain about that ruling. *See Tittizer v. Union Gas Corp.*, 71 S.W.3d 857, 862 (Tex. 2005) ("invited error" doctrine provides that a party cannot successfully lodge an appellate challenge to a trial court action the complaining party asked the court to take).

Fifth, Mian complains that it had a "Hobson's choice"—exclude the data or allow it to come in so that Mian could cross-examine the experts. Assuming that premise were true, trial

lawyers make strategy calls every day.  But it is inappropriate to subsequently assign error to those strategic decisions that do not go according to plan.

Sixth, Mian argues that even if Browne said he did not need to rely on the excluded data, this is "far from the truth."  Again, if Mian wanted to develop this theory or challenge Browne's veracity concerning reliance on the excluded data, it should have requested a hearing outside the jury's presence and asked the court's permission to do so.  *See* TEX. R. APP. P. 33.1(a)(1).[14]

Finally, even if Browne (and others) relied on the data, it is well-established that experts can "rely on inadmissible hearsay, privileged communications, and other information that the ordinary witness may not." *In re Christus Spohn Hosp. Kleberg*, 222 S.W.3d 434, 440 (Tex. 2007) (orig. proceeding).  Here, nothing shows that the complained-of data wasn't data that appraisers would rely on in forming an opinion regarding the property's value.  *See* TEX. R. EVID. 703.

### c.     Pursley

#### (i).     Introduction

From an overall perspective, Pursley's net contributions to the evidentiary stew were his opinions that (i) the Sterling's pre-taking value was 26% higher than Browne's highest valuation; (ii) the land taking did not significantly affect the Sterling's post-taking value; and (iii) Mian would incur $598,301 in costs to cure the parking situation resulting from the taking.

More specifically, Pursley testified that the Sterling is in an industrial area and he believes it was constructed to supply the demand from Texas Stadium.  Now that Texas Stadium is closed, the hotel is at a competitive disadvantage to other hotels.  His HBU analysis concluded that the

---

[14] Mian first raised the argument that its ability to cross-examine the experts in its motion for new trial.  In fact, during the hearing on that motion, when discussing the portions of the experts' testimony that were excluded, Mian observed "If you open the door, it comes back in . . . So we don't - - we can't cross-examine on it.  We can't bring it up 'cause we don't want to put it back in.  On top of which, it's fraudulent for us to say that it should have gone out and then put it back in."

Sterling's highest and best use was industrial if vacant. As improved, its highest and best use is to continue its current operation.

For his analysis, Pursley estimated the value of the land based on comparable vacant land sales and the value of the improvements based on the Marshall-Swift Cost Guide.[15] The comparable sales ranged from $3.02-$5.15 per square foot, which Pursley adjusted based on their comparison to the Property. The adjusted range was $3.32-$5.66 per square foot, so he used $5 per square foot for his estimate. Using this calculation, he valued the remainder land at $949,080.

Next, Pursley valued the remainder improvements, relying on the Marshall-Swift guide to determine the building's replacement cost. He used a forty-five year economic life to calculate depreciation, and because the Sterling is forty years old, he calculated the improvements' depreciated value at 90%. The improvements' depreciated value was $4,129,574, which, added to the $949,080 land value, resulted in a $5,078,654 total property value before the acquisition.

Pursley performed a new appraisal to value the remaining property after the acquisition. The primary difference between the Property before and after the taking was the loss of parking. But Pursley did not find any damage as a result because there was no reduction in the use or utility of the Property.

Pursley added $166,669 (the value of the property being acquired) to $598,301 (the estimated cost to reconfigure the parking lot and restore the garage function) to conclude that Mian was entitled to $764,970 total compensation.

Mian argues that the trial court erred by denying its challenge to Pursley because he: (i) used flawed methodology by using only the cost approach; (ii) relied on Walker's "unreliable opinions and data" for his HBU determination; and (iii) relied on unreliable data that the trial court excluded, leaving Pursley with no underlying data to support his trial opinions and thus leaving

---

[15] Marshall-Swift is a cost-estimating service that produces a manual.

Mian with no effective way to cross-examine him. For the same reasons discussed above, we reject the latter two arguments, and consider only whether Pursley's cost-only methodology was flawed.

### (ii). Methodology

Mian's sole complaint about Pursley's methodology is that he used only the cost approach to determine market value. We disagree.

The cost approach is one of the three approved appraisal methods. *See Sharboneau*, 48 S.W.3d at 182. This approach assumes that "an informed purchaser of the property would pay no more than the cost of constructing a like property with the same usefulness as the property to be valued." *Polk County v. Tenneco, Inc.*, 554 S.W.2d 918, 921 (Tex. 1977). Using this method is usually a secondary approach to valuation and tends to set the upper limit of market value. *Id*. The cost approach is acceptable if it is made clear to the jury that "the ultimate point of inquiry and decision is market value." *Religious of Sacred Heart of Texas v. City of Houston*, 836 S.W.2d 606, 616 (Tex. 1992).

Mian relies on *City of Sugar Land v. Home and Hearth Sugarland*, 215 S.W.3d 503, 515–16 (Tex. App.—Eastland 2007, pet. denied) to argue that the cost approach is only appropriate in a few narrow circumstances not present here. Mian's reliance is misplaced for several reasons.

To start, it is hard to say that using the cost approach was inherently improper in the abstract since every expert in the case also used that approach. Instead, the issue was whether the trial court should have rejected Pursley's testimony because he concluded that the facts did not warrant using the other approaches in this case too.

Next, in *Sugarland,* an appraiser used the cost approach to support his damage model and the income approach as a method of comparison when calculating a hotel's diminished value. The court noted that, "Whether to allow testimony as to the cost approach . . . is a function of the court

as a gatekeeper." *Id*. at 515. The court further wrote that, "No matter which appraisal method an expert uses . . . it is valid if it produces an amount that a willing buyer would actually pay a willing seller." *Id*. Rejecting the challenge to the cost approach, the court concluded that, because the property was unique and not frequently exchanged in the market place, the cost approach was a proper barometer for assessing market value. *Id*. at 515–516. The opinion, however, does not suggest that the use of the cost approach is limited only to the unique circumstances in that case.

Further, the evidence here also involves circumstances that arguably support Pursley's use of the cost approach. Pursley testified that he looked for data to support the other approaches but found it lacking. He explained that the Sterling was near the end of its economic life and investors will not purchase a property if they cannot recoup their investment. Comparable properties would also be at the end of their economic life and suffer similar external depreciation. Pursley did not find enough comparable sales that, in his opinion, were truly comparable, and thus to use that approach he would have to make adjustments that were "too subjective."

Likewise, when Pursley attempted an income approach analysis, he did not find enough market data to indicate the Sterling could generate sufficient income to induce an investor to purchase the Property. Given the absence of data supporting the income or comparable sales approaches, Pursley performed a cost approach. Pursley adequately explained the special circumstances supporting his use of the cost approach.

Significantly, in Pursley's testimony and throughout the case, there was never any question but that fair market value was the ultimate focus of the jury's determination, and Mian does not contend otherwise. The jury received cost method evidence from three other witnesses along with their opinions regarding the income and comparable sales approaches. The jury was able to sift through all of the competing evidence and give Pursley's opinions the weight it deemed proper.

Finally, Mian does not argue that admitting Pursley's testimony alone constituted reversible error. Rather, Mian argues that the combined alleged errors in admitting the testimony of the State's experts collectively produced reversible error.

Based on the record before us, we cannot conclude that the trial court abused its discretion by admitting Pursley's testimony.

### 4. Conclusion.

The trial court did not abuse its discretion by denying the requested exclusion of the State's experts and, therefore, Mian's constitutional rights were not violated. Appellant's first and second issues are resolved against it.

### B. Third Issue: Did the trial court err by denying Mian's motion for new trial?

No. We cannot conclude that the jury's verdict in this contest between competing experts is so contrary to the overwhelming weight of all the evidence to be manifestly unjust and we have previously disposed of Mian's other motion for new trial arguments.

Mian's third issue argues that the trial court erred by denying Mian's motion for new trial because: (i) had Walker, Browne, and Pursley been excluded, the verdict would have been different, (ii) excluding the expert's unreliable data but allowing the experts to testify deprived Mian of the ability to cross-examine the experts, and (iii) the evidence is factually insufficient to support the verdict.

### 1. Expert Testimony and Cross-Examination

We have concluded that the trial court did not abuse its discretion regarding the admissibility of expert testimony. Therefore, the trial court did not err by denying the motion for new trial on these grounds.

### 2. Sufficiency of the Evidence

Mian further argues that the evidence is *factually* insufficient because the court admitted unreliable expert testimony. Ordinarily, parties argue that unreliable expert testimony renders the evidence *legally* insufficient. *See Whirlpool Corp. v. Camancho*, 298 S.W.3d 631, 638 (Tex. 2009). To the extent Mian intended to assert a legal sufficiency challenge, we have already concluded that the complained-of testimony was reliable. Moreover, competing expert opinions are not legally insufficient because they contradict each other. Rather, they raise fact issues for the jury to resolve. *McKinney Indep. Sch. Dist. v. Carlisle Grace, Ltd.*, 222 S.W.3d 878, 882 (Tex. App.—Dallas 2007, pet. denied). Thus, a legal sufficiency challenge fails.

When reviewing an issue asserting that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering all of the evidence in the record pertinent to that finding, we determine that the credible evidence supporting that finding is so weak, or contrary to the overwhelming weight of the evidence, that the evidence should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g).

Mian's issue does not challenge a specific fact finding, but it appears to concern the damages the jury found. Mian's appraisers opined that the property was unviable after the taking, and gave the jury two figures for total compensation $13,600,101 and $19,100,000. On the other hand, the State's appraisers opined that the property was viable post-taking and offered total compensation figures of $764,970 or $1,027,927. As previously discussed, these opinions were supported by facts, market data, and significant analysis.

The jury found that the fair market value of the taken tract was $286,350 and the damages to the remaining property resulting from the taking $900,000. Whether the jury was convinced of the market value derived from a particular market value methodology goes to the credibility and weight given to the experts' testimony, of which the factfinder is the sole judge. *City of Sherman*

*v. Wayne*, 266 S.W.3d 34, 48 (Tex. App.—Dallas 2008, no pet.). Indeed, "a jury hearing opinion and all testimony bearing on a condemned property's market value is enlightened to give weight to the evidence and render its own conclusion." *Collin Co. v. Hixon Family P'ship, Ltd.*, 365 S.W.3d 860, 870 (Tex. App.—Dallas 2012, pet. denied). Other than the expert challenges we have already addressed, Mian does not explain how, nor does the record reflect that, the jury's findings are so contrary to the overwhelming weight of the evidence that they must be set aside. *See Pool*, 715 S.W.2d at 635. We resolve Mian's fourth issue against it.

**C.     Fourth Issue:  Is there cumulative error requiring reversal?**

Mian's fourth issue globally argues that "as discussed in its brief" "there were multiple errors made by the trial court that, when considered together, lead to the rendition of an improper judgment." Accordingly, Mian requests that we remand the case for a new trial.

Assuming that this global reference to error previously argued was sufficiently briefed, we have concluded that there was no error. It necessarily follows that there was no cumulative error. *See In re BCH Development, LLC*, 525 S.W.3d 920, 930 (Tex. App.—Dallas 2017) (orig. proceeding) (when there are no errors, we reject cumulative error arguments). We thus resolve Mian's fourth issue against it.

### III.  CONCLUSION

Having resolved all of Mian's arguments against it, we affirm the trial court's judgment.


/Bill Whitehill/
BILL WHITEHILL
JUSTICE


171385F.P05



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

THE MIAN DEVELOPMENT
CORPORATION, Appellant

No. 05-17-01385-CV          V.

THE STATE OF TEXAS, Appellee

On Appeal from the County Court at Law
No. 5, Dallas County, Texas
Trial Court Cause No. CC-14-03073-E.
Opinion delivered by Justice Whitehill.
Justices Molberg and Reichek participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellee THE STATE OF TEXAS recover its costs of this appeal from appellant THE MIAN DEVELOPMENT CORPORATION.

Judgment entered December 3, 2019